485 F.2d 752
 5 Fair Empl.Prac.Cas. 746,
6 Fair Empl.Prac.Cas. 119,
5 Empl. Prac. Dec. P 8495,
6 Empl. Prac. Dec. P 8784, 157 U.S.App.D.C. 381
 NORTHEAST CONSTRUCTION COMPANY
v.
George ROMNEY, Secretary of Housing and Urban Development,
and Elmer B. Staats, Comptroller General of the
United States.
BIRD ASSOCIATES, INC., Appellant.
NORTHEAST CONSTRUCTION COMPANY
v.
George ROMNEY, Secretary of Housing and Urban Development, et al.
BIRD ASSOCIATES, INC., Appellant.
NORTHEAST CONSTRUCTION COMPANY
v.
George ROMNEY, Secretary of Housing and Urban Development,
et al., Appellants,
Bird Associates, Inc.
 Nos. 71-1650, 71-1891 and 71-1893.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 8, 1972.
Decided March 6, 1973.
Rehearing Denied June 6, 1973.
 
 Roger K. Zuker, Oxon Hill, with whom Gary R. Alexander, Marlow Heights, Md., was on the brief, for appellant in Nos. 71-1650 and 71-1891.
 Eloise E. Davies, Atty., Dept. of Justice, with whom L. Patrick Gray, III, Asst. Atty. Gen. at the time the brief was filed, Harold H. Titus, Jr., U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellants in No. 71-1893. Thomas A. Flannery, U. S. Atty. at the time the record was filed and Morton Hollander, Atty., Dept. of Justice, also entered appearances for appellants in No. 71-1893.
 Abraham J. Harris, Washington, D. C., for appellee.
 Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This appeal is from a preliminary injunction enjoining the Secretary of Housing and Urban Development (HUD) from awarding a contract, for the rehabilitation of certain public housing units in the Anacostia section of Washington, D. C., to anyone other than the plaintiff, Northeast Construction Company.[1] We reverse.
 
 
 2
 I. Material Facts; and District Court's Order
 
 
 3
 The invitation for bids issued in January 1971 incorporated the provisions of the "Washington Plan," which requires a prospective contractor to complete an "Appendix A" specifying his estimated total employment under the contract in designated trades over a four year period and the percentage of minority group employees to be included ("minority" being Negro, Spanish surname American, Oriental and American Indian), within prescribed ranges established by the Secretary of Labor. The execution of Appendix A, or its equivalent, is made prerequisite to eligibility for a contract award for federal construction projects costing in excess of $500,000 by an order promulgated by the Secretary of Labor on June 1, 1970, implementing Executive Order 11246, as amended, requiring equal employment opportunity by federal contractors.[2]
 
 
 4
 When the bids were opened on March 11, 1971, the two low bidders were found to be Northeast with a bid of $1,047,500 and Bird Associates, with a bid of $1,094,645. The plaintiff was thus the low bidder by $47,145. However, upon examining Northeast's bid, HUD's contracting officer noted that the company had failed to supply its goals for minority manpower employment in Appendix A. When the omission was called to the attention of Northeast's president, who was present at the opening, he pointed out that he had signed the Appendix in the two places provided thereon for signature.[3] He stated that, by signing Appendix A on its 4th and 12th pages, he had thereby intended to commit himself to employ at least the minimum percentage of minority workmen specified by the Government.[4] Two days later, by letter to the Government he reduced this oral commitment to writing. On April 6, 1971, HUD advised Northeast that it was ineligible for the contract award, since its bid was not deemed responsive to the bid invitation.
 
 
 5
 Northeast immediately protested the rejection to the Comptroller General. On June 7, 1971, the Comptroller General advised Northeast that its failure to submit specific goals for minority manpower utilization made it ineligible for the contract award.
 
 
 6
 The Comptroller General noted that the invitation in terms expressly requires that the bid as filed contain a completed Appendix A, with specific goals for minority manpower utilization,[5] and even provides blanks to be filled out by the bidder, by trade and time period. He concluded that under 41 C.F.R. Sec. 1-2.405,[6] this omission was not a deviation that could be waived or corrected.
 
 
 7
 *****
 
 
 8
 * * *
 
 
 9
 On June 10, HUD sent a notice of intent to award the contract to Bird Associates. On the following day, Northeast filed this action, naming as defendants both the Secretary and the Comptroller General.
 
 
 10
 The District Court granted a preliminary injunction on June 21, 1971, stating:
 
 
 11
 The Court does not agree that plaintiff's bid was not responsive. The signatures of plaintiff's president on Appendix A was sufficient to bind it to employ the minimum percentage of minority workmen. The failure to copy these figures in the blanks provided was at most a minor irregularity covered by the provisions of 41 C. F.R. Sec. 1-2.405, which allows for their correction. It should be noted in this context that the requirement that bids be responsive and that no modifications are allowed after opening is to protect the integrity of the bidding system. It is to prevent a bidder from gaining an unfair advantage over other bidders by altering or withdrawing his proposal after other bids have been revealed. Exceptions to the strict responsiveness rule are allowed so that the government can accept advantageous bids that deviate only in minor detail, such as in form. Here plaintiff's bid was non-responsive only in the form in which it indicated that it intended to employ at least the specified minimum percentages of minority workers.
 
 
 12
 In a Memorandum opinion of August 23, 1971, denying reconsideration, Judge Gasch stated:
 
 
 13
 The Court notes that Appendix A does contain a specific requirement that the blanks be filled out. The Court also notes that Appendix A specifically permits a bidder to adopt his own form for replying to the requirements of Appendix A, requiring only that it be "substantially similar." The Court concludes that if a contractor agrees to make a good faith effort to commit himself to the minimum range of percentages indicated in Appendix A that he has thereby substantially complied with the requirements of Appendix A.[1]
 
 
 14
 ******
 
 
 15
 * * *
 
 
 16
 Since Northeast committed itself both orally and in writing to employ the specified minimum range of minority group workmen, the Court interprets this as substantial compliance with the provisions of Appendix A. It is also noted that Northeast's bid was the first bid opened and that Northeast's oral commitment was received before the opening of any other bids. Its written commitment was received a day or so later and in view of the provisions respecting the correction of minor errors heretofore noted in the Code of Federal Regulations, 41 C.F. R. 1-2.405, the Government should have permitted the low bidder to make the corrections indicated in his written communication, even if it was unwilling to accept the oral representation to that effect.
 
 
 17
 ******
 
 
 18
 * * *
 
 
 19
 The Court concludes that absent substantial reasons to the contrary, a low bidder is entitled to the award. There was no rational basis for concluding that a contractor who committed his organization to the requirements of Appendix A and who was the low bidder by approximately $47,000 was not entitled to this award. To rule otherwise under these circumstances was to act arbitrarily and capriciously.
 
 
 20
 We conclude that the preliminary injunction should be reversed. We are mindful of the broad latitude and discretion vested in the trial court, and do not predicate our reversal on any difference of approach as to such matters as its finding that plaintiff was threatened with irreparable injury, and that grant of injunctive relief is responsive to the balancing of the equities and conveniences of all parties. But a preliminary injunction must be reversed even where no abuse of discretion exists as to such matters, when the trial court has proceeded upon a premise as to the rule of law which the appellate court deems erroneous.[7] We conclude that underlying the District Court's conclusion of law, that plaintiff is likely to succeed on the merits, is an erroneous legal premise that requires reversal.
 
 II. Pertinent Principles
 
 21
 1. The District Court's memorandum adverts to certain matters that, on reflection, we find to be not material. We refer, for example, to the fact that plaintiff's bid was opened first. If it was sufficient in law as a bid, it would make no difference whether it were opened first or last, and counsel for plaintiff-appellee agreed, when pressed at oral argument.
 
 
 22
 2. Similarly as to the statements of plaintiff's representatives, at the bid opening and later in writing, that its intention in signing Appendix A was to commit plaintiff to hire the minimums in the range of percentages set forth in Appendix A. The question is, at best, the effect of the bid as signed and submitted. Certainly if it did not bind plaintiff, the later statements could not cure the omission. The effect of such an approach would be to permit a bidder who repented his bid-perhaps on seeing that his bid was too far below the next bidder to be economically sound-to step away from the matter by simply failing to supply the omission.
 
 
 23
 3. A legal question arose whether a contractor who omitted the specific goals had bound himself, whether he might successfully argue that he had failed to complete the indispensable pre-requisite for any commitment; that the contract document must be construed strictly against the party who prepared it [the Government], and as prepared the document did not provide for a commitment in the absence of insertion of specific goals.[8]
 
 
 24
 Is the procurement officer required to resolve this legal question, which at the very least the wording of the Appendix sought to avoid? Even if he projected as probable that a Federal court would ultimately rule, as Judge Gasch did, that there was such a commitment, is the procurement officer required to buy a lawsuit?[9] Is not the Government's interest in this commitment important enough to require it in the bid, as filed, in the form of specific goals, without any question as to supplementation, and without any if, ands, or buts?
 
 
 25
 4. The problem thus far discussed supports the reasonableness of the procurement officer's rejection of the bid. There must also be taken into account that this is not a case where the requirements of the bid in question were initiated by the authorities handling the procurement, or even by their agency. These provisions were mandated by the Secretary of Labor. The paragraph incorporating Appendix A into the IFB states that the appendix "stipulates Contractor responsibilities under government requirements for affirmative action to assure compliance with Equal Employment Opportunity Requirements of Executive Order 11246 for Federally involved Construction Contracts."
 
 
 26
 Appendix A is substantially the same as the contents of the Washington Plan, adopted by the Secretary of Labor, and published in the Federal Register for December 22, 1970, 35 F.R. 19352 ff; see 41 C.F.R. Sec. 60-5.1 et seq. This is an order by the Secretary of Labor, which provides, 40 C.F.R. Sec. 60-5.21:
 
 
 27
 "Sec. 60-5.21 Order.
 
 
 28
 After full consideration and in view of the foregoing it is:
 
 
 29
 (a) Ordered:
 
 
 30
 (1) That no contracts or subcontracts shall be awarded for Federal and federally-assisted construction in the Washington, D. C., Standard Metropolitan Statistical Area on projects whose estimated cost exceeds $500,000 unless the bidder completes and submits, prior to bid opening, the document identified as Appendix A, Notice of Requirement for Submission of Affirmative Action Plan to Ensure Equal Employment Opportunity or a substantially similar document, which shall include specific goals of minority manpower utilization for each trade designated below which will be used by the contractor on all of his work within the Washington, D. C. Standard Metropolitan Statistical Area during the term of his performance of the contract, such goals to be established by the contractor at least within the ranges established by these rules.
 
 
 31
 (2) A bidder who fails or refuses to complete or submit such goals shall not be deemed a responsive bidder and may not be awarded the contract or subcontract, but such goals need be submitted only for those trades to be used in the performance of the Federally-involved contract. In no case shall there be any negotiation over the provisions of the specific goals submitted by the bidder after the opening of bids and prior to the award of the contract. (emphasis supplied).
 
 
 32
 The authority of the Secretary of Labor is established by Executive Order 11246, Equal Employment Opportunity, 30 C.F.R. 12319 (Sept. 24, 1965), which provides:
 
 
 33
 Sec. 201. The Secretary of Labor shall be responsible for the administration of Parts II and III of this Order and shall adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof.
 
 
 34
 ******
 
 
 35
 * * *
 
 
 36
 Sec. 205. Each contracting agency shall be primarily responsible for obtaining compliance with the rules, regulations, and orders of the Secretary of Labor with respect to contracts entered into by such agency or its contractors.
 
 
 37
 The local plans are issued by the Department of Labor to implement the requirement of E.O. 11246 that contractors "take affirmative action" to ensure employment for minorities. "The Labor Department interpretation of the affirmative action clause must, therefore, be deferred to by the courts." Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159, 175 (3d Cir. 1971).
 
 
 38
 With Federal departments and agencies, and their procurement officials, being mandated to comply with Labor Department regulations, and with those regulations mandating the information that must be contained in the bids when filed, we do not think a procurement official can be held to be unreasonable if he follows his mandate. Indeed, we think a serious question would arise whether the procurement official could take it on himself to justify a departure from the Labor Department's mandate by reference to 41 C.F. R. Sec. 1-2.405,[10] which provides that in case of a "minor informality or irregularity" the contracting officer shall either give the bidder an opportunity to make a correction or shall waive the deficiency. That provision of the Federal Procurement Regulations treats a defect in a bid as "immaterial and inconsequential" if it lacks significance "as to price, quantity, quality or delivery." This must, however, be read in conjunction with the basic procurement statute that awards or bids shall be made "to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered." 41 U.S.C. Sec. 253(b).[11] And whether a bid complies in all material respects with the invitation depends on whether the method and timeliness of submission maintains the integrity of the procurement system. 41 C.F.R. Sec. 1-2.301.[12]
 
 
 39
 *****
 
 
 40
 * * *
 
 
 41
 Appellee's counsel seizes, dramatically, on certain language in 41 C.F.R. Sec. 1-2.405. That regulation begins by stating that a minor informality is one pertaining "to some immaterial or inconsequential defect or variation of a bid from the exact requirement of the invitation for bids, the correction or waiver of which would not be prejudicial to other bidders." It goes on to state: "Examples of minor informalities or irregularities include: * * * (b) Failure to furnish required information concerning the number of bidder's employees." This provision, of long standing in government contracts, certainly antedating the minority employment plans[13] relates to a distinct and different subject-employment capability at the time of the bid-which does not involve any commitment. What the Washington Plan, and Appendix A, called for was a statement of specific goals for the future period, not as of the time of the bid, and a commitment for minority utilization. The specific command of the Appendix A regulation clearly states and reiterates a bid lacking the pertinent information concerning projected employers and specific goals will be deemed nonresponsive. Whether or not other bidders would be prejudiced by subsequential insertion, the Government's broad policy objective may be prejudiced by the omission.
 
 
 42
 Appellee's reliance on the "Minor Informalities" regulation overlooks a well-established distinction between the responsibility of the bidder and the responsiveness of the bid, a distinction discussed in 48 Comp.Gen. 291 (1968). Questions of bidder responsibility essentially relate to whether a given bidder has the necessary resources and experience to perform a given job, and advertised bids often request material pertinent in this regard. As the Comptroller General has stated, however, bidder responsibility is ultimately a question of fact:[14]
 
 
 43
 Recognizing the desirability, both from the standpoint of administrative convenience and from that of the prospective bidders who may be saved useless expense and effort, of including in invitations for bids some notice to bidders of minimum standards to be applied in determining the qualifications of bidders, we feel nevertheless that the statement of such qualifications should not be considered as having the effect of transforming the purely factual question of responsibility into a legal question of conformity to the invitation.
 
 
 44
 Questions of the "responsiveness" of the bid, on the other hand, relate to "conformity with the invitation" and are generally not curable after bid opening. In our judgment, the example in 41 C.F.R. Sec. 1-2.405, of failure to furnish required information concerning the number of employees at time of bid relates to responsibility, where the Government may want to know whether a particular bidder has the employment capability to perform the contract. Since such questions are not material to bid openings,[15] though they well may be to contract award, after procurement authorities conduct appropriate inquiries, their absence is properly considered to be a "minor informality."
 
 
 45
 In the case before us, however, as Appendix A plainly indicates, the information pertinent to minority utilization goals, including both number of employees during the period of performance and minority percentage had-under directive of the Secretary of Labor -been made a question of "responsiveness" to the bid pointing toward obtaining effort and obligation from all responsive bidders. That regulation overrides any general concept that the characteristics of a bidder relate to responsibility rather than responsiveness, and makes it clear that in this context what was involved was information necessary for "responsiveness" of the bid. While usually the "experience" of the bidder is a matter of responsibility, there are occasions when it rises to the level of responsiveness of the bid-provided this is made clear in the invitation for bids. See 52 Comp.Gen-(No. B-175254, August 16, 1972).
 
 
 46
 This is not the case of a bidder who may claim he was misled by two inconsistent provisions in the specifications furnished to him. Here the specifications furnished him were clear and specific, and they were ignored. He cannot realistically be heard to say that he was relying on the minor irregularities clause of 41 C.F.R. Sec. 1-2.405(b). If he knew that much about government procurement, he knew enough to know that he was governed by the regulation, with directions, in Appendix A, that were both specific and reiterated.
 
 
 47
 Whatever the latitude provided to a procurement official under 41 C.F.R. Sec. 1-2.405 in case of a conventional procurement question, the matter stands on an entirely different footing when the question arises under one of the clauses that have been inserted, over the years, into the "clauseology" of today's government contract.[16] Congress and the President have increasingly had recourse to the procurement power for nonprocurement objectives, as "a device for the accomplishment, implementation, or even formulation of important national policies and goals, as a sophisticated technique for public administration as well as procurement . . . . conditioning the award or the terms of government procurement contracts in order to promote national social or economic standards or goals that in themselves had no immediate relevance to supplying the particular procurement need."[17]
 
 
 48
 The difficulty posed by this case is that the mold of our recent decisions giving the disappointed bidder a remedy in case of action that either disregards or arbitrarily and unreasonably misapplies procurement regulations,[18] has been used for the casting of a challenge taken to a provision of a regulation issued for a social or economic objective. Such social or economic objectives may be sufficiently related to procurement considerations in a broad sense and over the long run to validate use of the procurement power by Congress or the President.[19] However, when, as is only natural, a department or agency with particular interest or concern in the social or economic problem has been given government-wide authority for the administration of this program now incorporated into the public contracts system, the controversy cannot be meaningfully considered solely in terms of standard procurement regulations, or by presuming authority in the procurement officials, typically located in other departments and agencies, to disregard the mandate of the department given responsibility for the new program. The procurement official would have no basis for saying that the information that the agency given responsibility-here, the Department of Labor-required be included in the bid as filed was only a formality, lacking in consequence, etc.
 
 
 49
 5. This does not mean that the disappointed bidder is lacking in remedies. He could contend that the Labor Department's requirement is invalid. Ultimately, he could bring an action in District Court to enjoin that department from persisting in its regulation, or for declaratory relief.[20] Initially, he could combine a protest to the procurement officer that he should be given the award with a protest to the department involved that its regulations should be amended, or applied, so as to permit supplementation after award. Certainly the procurement system is well acquainted with requirements as to responsibility that may be satisfied after the filing of the bid. See e. g., Ocean Electric Corp. v. Laird, supra note 15. But whether that is satisfactory depends on the needs of the agency responsible for issuance of the (government-wide) requirement. Some opportunity must be given that agency to consider the objection of the disappointed bidder and the question whether his proposal satisfies its regulatory needs. That opportunity is a precondition to judicial intervention, under the principle of exhaustion of administrative remedies.
 
 
 50
 The District Court erred in proceeding to preliminary injunction, on a hypothesis that plaintiff would probably prevail on the merits in establishing that the omission in the bid was waivable or correctible, in the absence of any administrative recourse whatever to the responsible department. The Government brief argues to this court that the plaintiff's omission in the bid frustrated the policy of the Labor Department's "affirmative action" Washington Plan.[21] At oral argument, plaintiff's counsel contended that the material omitted was needed by the Labor Department solely for statistical purposes, and that the Labor Department's requirement that this material be contained in the bid as filed was unnecessary to its purpose. But in the absence of any recourse to the Labor Department, we do not have the administrative consideration that is a precondition to sure-footed judicial analysis.
 
 
 51
 The same considerations govern the District Court's conclusion that the bid as submitted substantially complies with the invitation, which permits use of Appendix A or "a substantially similar document." Under Appendix A the bidder is required to submit, for each of the various trades, and for all work done in the Washington area (not merely the work on this contract) the total number of employees to be used and the number of minority employees to be included in that total.
 
 
 52
 There was no way for the procurement official to supply these figures even assuming, arguendo, that the bidder could be taken in law to have made a commitment to hire minority employees to the extent of the specific goal percentage that was the minimum acceptable under Appendix A. The document filed by plaintiff cannot be considered "substantially similar" to a properly completed Appendix A unless one is prepared to assert that the missing data are of no real consequence to the Government's program administered by the Labor Department.[22] And here there was no presentation of the question to the Labor Department.
 
 
 53
 Reversed.
 
 BAZELON, Chief Judge, dissenting:
 
 54
 I agree with the majority that a bidder's statement of minority hiring goals is a legitimate and significant interest of government contracting officers. The rub in this case is that the government's procurement regulations clearly state that a bidder's failure to submit the number of his employees is a "minor informality or irregularity." Perhaps that regulation should be amended to indicate that the number of minority employees is not a minor item. Until the amendment is made, bidders have the right to expect that contracting officers will follow the mandatory requirements of their own regulations.
 
 
 55
 The error in Northeast's bid falls precisely into the category described in 41 C.F.R. Sec. 1-2.405 as "minor informalities or irregularities". As explained in the majority opinion, "Appendix A" calls for information on the total number of employees on the contract in each designated trade, and the number of minority employees in each trade. That information was a required part of the bid package. Thus Northeast's failure to fill in the blanks on "Appendix A" was a "Failure to furnish required information concerning the number of bidder['s] employees". Such a failure is set forth in the procurement regulations as an example of a minor informality.[1] In such a case, the regulations provide as follows: "The contracting officer shall either give the bidder an opportunity to cure . . . or waive such deficiency, whichever is advantageous to the government." (emphasis added).
 
 
 56
 The continuing mystery in this case is why the contracting officer refused to follow the established procedure for dealing with minor informalities. Given the importance of "Appendix A", it is understandable that the government would not choose to waive the deficiency in Northeast's bid. Eliminating that alternative, the contracting officer was required to allow Northeast to correct its oversight. Had the officer accepted Northeast's letter curing the deficiency, he would have achieved both of his legitimate objectives: award to the lowest bidder, and a written commitment to specified hiring goals.
 
 
 57
 It was suggested at oral argument that Northeast's bid was rejected because its mistake on "Appendix A" demonstrated a lack of true commitment to minority hiring. This is a reasonable concern. The success of minority hiring programs depends on something more than mechanical compliance with numerical requirements. The government is justified in demanding that its contractors demonstrate a sincere interest in equality of opportunity.
 
 
 58
 Northeast contends, however, and I agree, that its error demonstrates not disinterest, but merely confusion. Even when measured against other government forms, where clarity is hardly a watchword, "Appendix A" is a remarkably obtuse document. It does not surprise me that a building contractor with little or no legal experience might assume that, in signing that portion of the form which set forth the government's hiring goals, he was committing himself to adhere to those goals. There is no reason to believe that Northeast's misreading of "Appendix A" evidenced bad faith; even if it did, that evidence would at least be offset by the firm's rapid submission of a separate, written commitment to minority hiring goals.
 
 
 59
 If the government is genuinely interested in enhancing minority employment in the building trades, it should think twice before requiring strict accuracy in the completion of arcane bureaucratic forms. It has been reported recently that small construction firms-including many minority firms-have been unsuccessful in competing for work on Washington's subway system largely because these firms cannot afford the legal and accounting expertise necessary to prepare a conforming bid.[2] The very existence of 41 C.F.R. Sec. 1-2.405 indicates that the government is aware of this problem.
 
 
 60
 Neither the contracting officer nor the GAO has explained why the regulation was not followed in this case. The majority opinion deals with this problem by suggesting that standard procurement regulations should not govern contract provisions designed for "nonprocurement objectives." This is an intelligent and valid distinction, and the government's contracting experts may well decide to incorporate it into federal procurement regulations. Until they do, however, I do not think we can apply such a rule. To do so would be unfair to Northeast and other contractors who have never been informed of it, and would impair the "public interest in having agencies follow the regulations which control government contracting."[3]
 
 
 61
 The majority opinion implies that the order of the Secretary of Labor implementing the "Washington Plan" creates a "mandate" requiring government procurement officers to disregard the regulations set forth at 41 C.F.R. Sec. 1-2.405. Here again the government may wish to amend its regulations to establish that this is so. At present, however, the existence of two contradictory regulations creates an ambiguity which must, of course, be construed against the government and in favor of the private contractor. M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 225, 455 F.2d 1289, 1303 (1971).
 
 
 62
 The majority cites three Comptroller General decisions which draw a distinction between the responsibility of a bidder and the responsiveness of a bid. All three decisions involved cases where a bidder's capacity to do the work was questioned. The responsibility/responsiveness distinction has been an important one in that context, but it hardly contributes to the resolution of the case before us. There is no dispute here as to Northeast's experience or capacity to perform. I do not fully understand the rationale for applying the distinction to the facts at hand. If the majority is suggesting that Northeast's mistake was a question of responsiveness, I agree: and I agree that such questions "are generally not curable after bid opening." But the general rule has certain exceptions, which are set forth explicitly in the federal procurement regulations. This case clearly falls into one of the specific exceptions. Under existing regulations, Northeast's failure to supply the number of its employees is curable, and the contracting officer was required to give Northeast the opportunity to cure.
 
 
 63
 It may be that the government is unwilling-for political purposes or otherwise-to state clearly in its regulations that minority employment is not a trivial matter. The majority and I share the view that minority hiring programs are of great importance. If the executive branch agrees, I would hope that this case will stir it to clarify its regulations on the point.
 
 
 64
 For the reasons stated above, I think Judge Gasch's order was eminently correct.
 
 ORDER
 
 65
 On consideration of appellee's petition for rehearing it is ordered by the Court that appellee's aforesaid petition is denied.
 
 
 66
 BAZELON, Chief Judge, dissents from the denial of rehearing.
 
 SUPPLEMENTAL OPINION
 LEVENTHAL, Circuit Judge:
 
 67
 We have considered appellee's petition for rehearing, and have sought and received supplemental memoranda. On reconsideration, we conclude that our decision was correct.
 
 
 68
 Perhaps there should be added to the original opinion the notation not only that the "minor informality" provision of 41 C.F.R. 1-2.405 was promulgated in 1960, long prior to the Washington Plan of October 1970, but also that an almost identical provision had been included in the Armed Services Procurement Regulations since 1955. See 32 C.F.R. 2-405. The latter provision has been understood to relate directly to the Small Business Act.
 
 
 69
 The enactment of the Small Business Act in 1953 rendered the size of a firm significant for procurement purposes.[1]
 
 
 70
 Under implementing regulations issued by the Small Business Administration the number of employees which a small business might have within the small business definition varied from industry to industry. See 41 Comp. Gen. 739-40 (1962). Bidders were asked to state the number of their employees so that contracting officers might determine whether their firms came within the relevant SBA small business definition. Such information clearly went to the "responsibility" of the bidder rather than to the "responsiveness" of the bid, since it did not affect the bidder's legal obligations. The term "number of employees" as used in the "minor informalities" provision relates to a firm's capacity and capabilities, to a matter of "responsibility". The recent Armed Services Regulations amendment pairing the term with "size status" reinforces this view.[2]
 
 
 71
 The number of employees of Northeast Construction Company within the meaning of the regulation, as indicated in the transcript of the proceedings below, was "three officers".[3] The bidder by executing Appendix A was required to show the "estimated total employment for the trade on the contract," and "the number of minority group employees and their percentage of the total" for the years 1971 through 1974. The two kinds of data are clearly unrelated; one goes to the "responsibility" or "eligibility" of the bidder, the other goes to the "responsiveness" of the bid.
 
 
 72
 Northeast makes a contention based on the placement of Sec. 1-2.405 in the Regulations, but on analysis we find this to be inconclusive.
 
 
 73
 We think it right to add that the wording of Sec. 1-2.405 presented a strong legal argument in this case, which commended itself to the District Court although we did not find it conclusive.
 
 
 74
 Under the circumstances, the District Court can take this into account in determining whether and to what extent damages should be assessed on the injunction bond.[4]
 
 
 75
 TAMM, Circuit Judge, concurs.
 
 
 
 [1]
 The District Court issued a preliminary injunction on June 22, 1971. The Government moved for reconsideration. On August 23, 1971, following a hearing at which intervenor Bird Associates Inc., also an appellant, was also heard, the court continued the injunction in full force and effect. It is from that order that the Secretary on September 28, 1971, took an appeal. Bird has also taken an appeal
 
 
 [2]
 The plan in its entirety is included in the Code of Federal Regulations at 41 C.F.R. Sec. 60-5 (A. 315-22); a model appendix similar to that provided by HUD to the bidders in this case is found at 41 C.F.R. Sec. 60-5.30. Executive Order 11246, as amended, is included in 30 F.R. 12319 (1965), 32 F.R. 14303 (1967), and 34 F.R. 12985 (1969)
 
 
 [3]
 The first part of Appendix A is a "Notice of Requirement for Submission of Affirmative Action Plan to Ensure Equal Employment Opportunity." This part provides spaces where a bidder may insert his goals for minority manpower utilization in designated working trades during the term of his performance of the contract "in conformity with the Requirements, Terms and Conditions of this Appendix A hereinafter set forth." App. 21. The "Requirements, Terms and Conditions" are contained in and comprises the second part of Appendix A. App. 24-32. On the sixth and seventh pages of Appendix A the Requirements, Terms and Conditions set out the percentage ranges within which contractors' goals for minority employment in the designated trades are to be set
 
 
 [4]
 While the Government disputes whether this oral statement was made, its position on appeal is that this is immaterial since an oral commitment would not cure a defect in the bid
 
 
 [5]
 See Comptroller General's ruling B-172581, p. 3:
 Section 1 of Appendix A states:
 "* * * unless the bidder completes and submits, prior to bid opening, this document designated as Appendix A * * * which shall include specific goals of minority manpower utilization for each trade designated below * * * during the term of his performance of the contract, such goals to be established * * * at least within the ranges established by this Appendix * * *.
 "A bidder who fails or refused to complete or submit such goals shall not be deemed a responsive bidder and may not be awarded the contract * * *. In no case shall there be any negotiation over the provisions of the specific goals submitted by the bidder after the opening of bids and prior to the award of the contract.
 "To be eligible for award, each bidder will be required to comply with this Appendix for the hereinbefore designated trades to be used during the term of the performance f he contract * * *." (Emphasis supplied.)
 In addition, paragraph 2 of amendment No. 1 states:
 "* * * Bidder is cautioned to complete Appendix A as required therein and return the completed Appendix A with the bid. Failure to do so shall cause the bid to be rejected as nonresponsive." (Emphasis supplied.)
 In view of the above, and as set forth below, we do not agree that a failure to submit specific goals for minority manpower utilization is a deviation which can be waived or corrected.
 
 
 [6]
 41 C.F.R. 1-2.405 permits a contracting officer to waive or permit correction of "a minor informality or irregularity . . . which is merely a matter of form and not of substance . . . pertain[ing] to some immaterial or unconsequential defect or variation of a bid. . . ."
 
 
 [1]
 The requirements of Appendix A are flexible in that good faith effort only is specified. Also a percentage range is provided. The obvious purpose of Appendix A is to encourage the employment of minority workmen. Where the sizes of the categories composing the actual work force are the subjects merely of estimates, the Government's requirement that the contractor apply a range of percentages to that estimated figure seems to be nothing more than an estimate on an estimate. By committing itself to employ the specified percentage of minority workmen, the low bidder, Northeast, is in practical effect every bit as committed as the second low bidder Bird, which has filed out the range of percentages on a yet unknown work force
 
 
 [7]
 Delaware and Hudson Ry. Co. v. United Transportation Union, 146 U.S.App.D.C. 142, 158, 450 F.2d 603, 619, cert. denied 403 U.S. 911, 92 S.Ct. 2209, 29 L.Ed.2d 689 (1971)
 
 
 [8]
 Appendix A says "The following are hereby submitted by the undersigned bidder as its goals for minority manpower utilization . . . to be achieved on all work of the bidder within the Washington, D. C. . . . Area during the terms of his performance of this contract in the trades specified below in conformity with the Requirements, Terms and Conditions of this Appendix A hereinafter set forth." And those Terms say: "The contractor's . . . goals established within the above ranges shall express the contractor's . . . commitment of the percentage of minority personnel who will be working in each specified craft. . . ."
 
 
 [9]
 The contention that there was no "commitment" in a bid with omissions, might well gain legal force from a favorable factual setting, if the contractor's Federal work had sufficient minority employment, but a breach was claimed in that his other work going on at the same time did not have sufficient minority employment, and all this was sought to be made the basis of, say a debarment from further Government contracts
 
 
 [10]
 41 C.F.R. Sec. 1-2.405:
 Minor informalities or irregularities in bids
 A minor informality or irregularity is one which is merely a matter of form and not of substance or pertains to some immaterial or inconsequential defect or variation of a bid from the exact requirement of the invitation for bids, the correction or waiver of which would not be prejudicial to other bidders. The defect or variation in the bid is immaterial and inconsequential when its significance as to price, quantity, or delivery is trivial or negligible when contrasted with the total cost or scope of the supplies or services being procured. The contracting officer shall either give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive such deficiency, whichever is to the advantage of the Government. Examples of minor informalities or irregularities include:
 (a) Failure of bidder to return the number of copies of signed bids required by the invitation for bids.
 (b) Failure to furnish required information concerning the number of bidders' employees.
 
 
 [11]
 41 U.S.C. Sec. 253(b):
 (b) All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: Provided, That all bids may be rejected when the agency head determines that it is in the public interest so to do.
 
 
 [12]
 41 C.F.R. 1-2.301:
 (a) To be considered for award, a bid must comply in all material respects with the invitation for bids so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained.
 
 
 [13]
 The "Minor Informality" provision was first promulgated on February 20, 1960. 36 Fed.Reg. 1510, 1516 (1960)
 
 
 [14]
 39 Comp.Gen. 173, 178 (1959), accord 48 Comp.Gen. 291, 297 (1968)
 
 
 [15]
 See Ocean Electric Corp. v. Laird, 154 U.S.App.D.C. 24, 473 F.2d 154 (D.C. Cir., 1972) (security clearance matter of "responsibility" of bidder and not material to bid opening, but essential only prior to the performance of work)
 
 
 [16]
 See J. Whelan, Underlying Values in Government Contracts, 10 J.Pub.Law 298 (1961)
 
 
 [17]
 H. Leventhal, Public Contracts and Administrative Law, 52 A.B.A.J. 35, 36-37
 
 
 [18]
 Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971)
 
 
 [19]
 See Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra, 442 F.2d at 170 ("it is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen")
 
 
 [20]
 Air Reduction Co. v. Hickel, 137 U.S. App.D.C. 24, 420 F.2d 592 (1969); Contractors Ass'n of Eastern Pa. v. Secretary of Labor, supra
 
 
 [21]
 "Finally, the thrust of the Washington Plan is the concept of affirmative action, embodied in Executive Order 11246, which it implements. The court below by characterizing plaintiff's failure to commit to specific goals as a mere failure 'to copy . . . figures in the blanks provided' (Opinion, June 22; A. 76) or 'to do the arithmetic said to be required by Appendix A' (Opinion, August 24; A. 331) clearly misconstrued the policy underlying this equal employment opportunity program. The Washington Plan anticipates that the construction contractor will make a knowing and thoughtful commitment based upon his own employment and recruitment situation. Thus, contrary to the view of the district court, there is no warrant for the substitution of government prescribed goals for the bidder's individual goals." Govt.Brief at p. 19
 
 
 [22]
 Or at least to say that the Labor Department cannot reasonably require that the information be supplied with the bid, and refuse to permit it to be furnished on a pre-award supplement
 
 
 [1]
 41 C.F.R. Sec. 1-2.405(b)
 
 
 [2]
 The situation is so serious that the Washington Metropolitan Transit Authority recently created an agency to help minority firms in preparing future bids. The Washington Post, Dec. 1, 1972, p. B1, col. 2
 
 
 [3]
 Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 376, 424 F.2d 859, 864 (1970)
 
 
 [1]
 A pertinent section of the Act, at 15 U. S.C. Sec. 632 provides:
 For the purpose of this title * * * a small business concern shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation. In addition to the foregoing criteria the Administration, in making a detailed definition, may use these criteria among others: Number of employees and dollar volume of business. (July 30, 1953, c. 282, Title II, Sec. 203, 67 Stat. 233). [Emphasis supplied].
 
 
 [2]
 The ASPR amendment has been construed by the Comptroller General, in one unreported opinion, B-170026, decided December 14, 1970, where it was argued in a bid protest that:
 The company failed to state whether or not it is small business as required by page 2 of Standard Form 33 at 33A. (P. 4).
 The Comptroller General ruled:
 ASPR-405(ii) [the equivalent of 41 C.F.R. 1-2.405(b)] specifically includes the bidder's failure to make a representation concerning his size status as an example of the type of minor informality that can be waived. Therefore, it is of no consequence that the company failed to indicate in its bid whether it is a small business concern.
 
 
 [3]
 A review of the record indicates that in fact the firm consists of three officers and one full time employee who acts as field supervisor, thus the correct number should have been "four." All construction workers were to have been furnished by subcontractors (Joint Appendix, Vol. I, pp. 115-117)
 
 
 [4]
 Page Communications v. Froehlke, 155 U.S.App.D.C. 1. 475 F.2d 994 (1973)