**GILBERT CENTRAL CORP., Plaintiff,**

v.

**John B. KEMP, Kansas Secretary of Transportation, Defendant.**

**Civ. A. No. 86–2226.**

United States District Court,
D. Kansas.

June 13, 1986.

John J. Gardner, Watson, Ess, Marshall & Enggas, Olathe, Kan., Paul R. Lamoree, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for plaintiff.

Michael B. Rees, Timothy P. Orrick, Kansas Dept. of Transp., Topeka, Kan., for defendant.

William G. Haynes, Eidson, Lewis, Porter & Haynes, Topeka, Kan., for proposed intervenor.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This action was commenced on May 12, 1986, when plaintiff filed both a complaint and an application for a temporary restraining order. The complaint alleged that plaintiff had been the lowest responsible bidder on a road construction contract to be let by defendant and that defendant had wrongfully rejected plaintiff's bid. The prayer sought both a declaratory judgment to that effect and a permanent injunction barring defendant from awarding the subject contract to any bidder other than plaintiff. After a May 13, 1986, hearing, we granted plaintiff's application for a temporary restraining order. A preliminary injunction hearing was held on May 28, 1986. At that time, the second low bidder on the project, J.H. Shears' Sons, Inc., ["Shears' "] moved for leave to intervene in the action. At the close of the hearing, plaintiff and defendant agreed to submit the issue on the question of *permanent* injunctive relief. In this memorandum and order, we address both the motion for leave to intervene and plaintiff's entitlement to permanent injunctive relief.

Plaintiff is a Delaware corporation with its principal place of business in Omaha, Nebraska. Over the years, plaintiff has submitted at least twenty bids on road construction contracts let in the state of Kansas. Defendant, Secretary of the Kansas Department of Transportation ["KDOT"], is ultimately responsible for the decision to accept or reject bids submitted on contracts let by KDOT. On those projects receiving federal financial assistance, however, KDOT is bound to comply with the regulations promulgated by the Federal Highway Administration ["FHWA"] and appearing at 49 C.F.R. Part 23.

The purpose of the federal regulations referenced above is to encourage the fullest possible participation in covered contracts by firms owned and controlled by

minorities and women. Such minority business enterprises ["MBE's"] consist of both disadvantaged businesses ["DB's"] and women-owned business enterprises ["WBE's"]. "Recipients" of federal financial assistance (including, for example, KDOT) are required to set both overall and contract goals for MBE participation. 49 C.F.R. § 23.45(g)(2)(i), (ii). Moreover, such overall and contract goals for MBE participation must be subdivided into participation goals for both DB's and WBE's. 49 C.F.R. § 23.45(g)(4). The regulations further require that recipients inform prospective bidders, in the solicitation for bids, that the apparent successful bidder will be required to submit information concerning MBE participation, including: (1) the names and addresses of MBE firms that will participate in the contract, (2) a description of the work each named MBE firm will perform, and (3) the dollar amount of participation by each named MBE firm. 49 C.F.R. § 23.45(h)(1)(i). So long as this information is submitted prior to the signing of the actual contract, the recipient may select the time at which it requires MBE information to be submitted. 49 C.F.R. § 23.45(h)(ii). Finally, the regulations provide as follows:

> (2) If the MBE participation submitted in response to paragraph (h)(1) of this section does not meet the MBE contract goals, the apparent successful competitor shall satisfy the recipient that the competitor has made good faith efforts to meet the goals.

49 C.F.R. § 23.45(h)(2).

On March 20 and 27, 1986, KDOT published a "Notice to Contractors" in the *Kansas Register.* Among the items noticed at that time was a solicitation for bids on a contract for 10.6 miles of surfacing and bridge work on U.S. Highway 50 in Reno County. Sealed bids were to be received by 10:00 a.m. on April 17, 1986. On April 2, 1986, plaintiff obtained a project proposal form for the Reno County project. Because that project was to receive federal financial assistance, the inch-thick proposal included a 14–page document (referred to by KDOT as a "Form 7–18–80–R8") intend-

ed to constitute KDOT's compliance with the requirements of 49 C.F.R. Part 23. Form 7–18–80–R8, also referred to as "Appendix III," is entitled "Utilization of Disadvantaged Businesses and Women-Owned Businesses."

Part III.A. of Appendix III directs all bidders to submit the DB/WBE participation information referred to in 49 C.F.R. § 23.45(h)(1)(i), plus figures showing the percentages of both DB and WBE participation compared to the total contract dollar amount. Bidders are also there advised, in all capital letters, that "EXCEPT AS NOTED ELSEWHERE, SUCH REQUIRED DB/WBE INFORMATION SHALL NOT BE SUBJECT TO REVISION AFTER BIDS ARE OPENED." Part III.B. of Appendix III then provides as follows:

> It is the low bidder's responsibility to meet the DB/WBE contract goals or to provide information to enable KDOT to determine that, *prior to bidding*, the low bidder made good faith efforts to meet such goals.

(Emphasis added.) On the Reno County project, KDOT set the overall MBE participation goal at 14 percent, with at least 12 percent of the contract amount going to DB subcontractors and at least 2 percent going to WBE subcontractors.

Only two contractors submitted bids on the Reno County project. Plaintiff submitted the low bid of $3,368,752.63. Plaintiff's bid listed four MBE subcontracts, with a total DB participation of 9.2 percent and a total WBE participation of 20.2 percent (with the latter figure later corrected by KDOT to 4.03 percent). Accordingly, plaintiff's bid indicated compliance with the WBE goal, but not with either the DB goal or with the overall MBE goal. Shears' submitted the other bid of $3,402,490.33. Although Shears' bid was $33,737.70 higher than plaintiff's, the MBE participation information included in Shears' bid indicated compliance both with the overall MBE goal and with each of the component DB and WBE goals.

Upon opening the bids, KDOT designated plaintiff the apparent low bidder but also noted that plaintiff's bid failed to comply with the DB participation goal. In accordance with 49 C.F.R. § 23.45(h)(2) and Part III.B. of Appendix III, KDOT requested plaintiff to submit evidence that it made a good faith effort to meet the DB participation goal. Plaintiff responded to that request with two letters and various informal discussions.

In essence, plaintiff's good faith submission rested on the following two factors. First, plaintiff had sent letters to fourteen DB subcontractors, and had called five others, prior to submitting its bid. In the twenty to thirty prior bids submitted to KDOT, plaintiff had followed a similar procedure and had always met the MBE participation goals. Second, plaintiff informed KDOT that, in plaintiff's opinion, it had actually *met* the DB participation goal. This was based on the fact that plaintiff learned, *after* the bid opening, from one of its intended *WBE* subcontractors that that subcontractor planned to further subcontract a part of its task to a *DB* subcontractor. The WBE subcontractor, MUV–ER, had obtained an oral quotation from the DB subcontractor, Bones Transportation, prior to the bid opening, but received the written quotation only afterward. By reallocating a portion of MUV–ER's participation percentage from the WBE category to the DB category, plaintiff would exceed the goals for both DB's and WBE's, as well as the overall MBE goal.

On May 2, 1986, KDOT sent a letter informing plaintiff of KDOT's intent to reject plaintiff's bid on the ground that no good faith effort had been shown. Four days later, various officials and employees of plaintiff met with KDOT officials to discuss the matter. The KDOT officials explained their rationale for rejecting plaintiff's good faith submission, and plaintiff presented no additional information at that time to convince KDOT that its position was incorrect.

Later that same day, May 6, 1986, plaintiff's officials and employees met with Mr. Robert Morrissey, the FHWA Divisional Administrator for the State of Kansas, to present their case. Morrissey was impressed with their presentation. A few days later, however, Morrissey met with KDOT officials to hear their rationale for rejecting plaintiff's bid. The KDOT officials convinced Morrissey that KDOT's position was correct. Shortly thereafter, Morrissey expressed his concurrence in KDOT's rejection of plaintiff's bid and in its corresponding decision to accept the bid submitted by Shears'.

Preliminarily, we address a legal issue raised by defendant at both hearings in this matter. Defendant asserts that plaintiff's complaint fails to state a cause of action under 42 U.S.C. § 1983 and that this proceeding against defendant is barred by the Eleventh Amendment to the United States Constitution. Plaintiff disagrees, asserting that its section 1983 claim is predicated on defendant's violation of the rights plaintiff enjoys under the due process, equal protection, and privileges and immunities clauses of the fourteenth amendment.

Plaintiff's equal protection and privileges and immunities challenges are clearly without merit. Arguably, though, plaintiff does state a valid claim for denial of procedural due process. The relevant Kansas statute provides that "[a]ll contracts for the construction, improvement, reconstruction, and maintenance of the highway system ... *shall be awarded* at a public letting *to the lowest responsible bidder.*" K.S.A. 68–410 (emphasis added). Construing an analogous statute applicable to contracts let by cities of the first class (K.S.A. 13–1017), the Kansas Supreme Court has held that an unsuccessful bidder is entitled to "injunctive relief preventing the award of the contract to one not legally entitled thereto." *Sutter Brothers Construction Co, Inc. v. City of Leavenworth,* 238 Kan. 85, 92, 708 P.2d 190, 196 (1985). For purposes of this case, then, we will assume (without so deciding) that this Kansas statute and supreme court opinion grant plaintiff a property interest in obtaining the Reno County contract. Accordingly, we

further assume that plaintiff states a valid section 1983 cause of action.

■ We also reject defendant's eleventh amendment argument. Plaintiff seeks only declaratory and injunctive relief, and it alleges that defendant's actions are contrary to the United States Constitution. Accordingly, defendant is stripped of any eleventh amendment immunity. *Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908).

Although plaintiff asserts a right to procedural due process, plaintiff nowhere defines what it perceives such process to include. Giving the plaintiff all benefit of the doubt, we will assume that due process requires defendant to adhere to all relevant provisions of 49 C.F.R. Part 23 and to all KDOT regulations promulgated in response thereto. As outlined above, those regulations require recipients of federal financial assistance (such as KDOT) to solicit information from bidders as to whether and how those bidders can meet or exceed the goals set for DB and WBE contract participation. Should the bidder fail to meet those goals, KDOT must still grant the bidder an opportunity to establish that it made a good faith effort to do so. 49 C.F.R. § 23.45(h)(1), (2).

Although plaintiff was the apparent low bidder on the Reno County project, KDOT concluded that plaintiff had neither met the MBE participation goals nor made a good faith effort to do so. In essence, plaintiff contends that both such determinations were conducted in a manner inconsistent with the governing regulations and were therefore actionable under section 1983.

■ Before addressing both KDOT's rationale for taking the action it did and plaintiff's objections thereto, we note our rather limited standard of review.

It is well established that great deference is due to the interpretation given an administrative regulation by the federal agency entrusted with its promulgation and interpretation. Moreover, when the administrative determination at issue concerns procurement of bid disputes, "if the court finds a reasonable basis for the agency's decision, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."

*Rossetti Contracting Co., Inc. v. Brennan,* 508 F.2d 1039, 1042–43 (7th Cir.1975) (quoting *Steinthal v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)) (other citations and brackets omitted). Admittedly, the instant case involves the propriety of a *state* agency's interpretation of a federal regulation. That interpretation, however, was ultimately ratified by the federal official responsible for supervising KDOT's compliance with the federal regulations. Because FHWA Divisional Administrator Morrissey concurred in KDOT's actions, both at the time the decision was made and again at the May 28, 1986, hearing, we will apply the deferential standard outlined above.

KDOT rejected plaintiff's contention that the Bones Transportation subcontract plaintiff discovered after the bid opening should be counted toward plaintiff's DB participation goal. Officials of KDOT stated two alternative reasons for their decision. First, the bid proposal had stated in all capital letters that "SUCH REQUIRED DB/WBE INFORMATION SHALL NOT BE SUBJECT TO REVISION AFTER BIDS ARE OPENED." Appendix III, Part III.A. Because the bid as submitted failed to list subcontracts amounting to the required 12 percent DB participation, and even failed to commit plaintiff to meeting that 12 percent goal, KDOT rejected plaintiff's bid as nonresponsive. Alternatively, KDOT would have rejected plaintiff's attempt to show compliance with the DB goal even if plaintiff had listed the Bones Transportation subcontract in its bid. In road construction jargon, a subcontractor of a subcontractor (such as Bones Transportation was of MUV–ER) is referred to as a "second tier subcontractor." As a matter of policy, KDOT refuses to count such second tier subcontracts toward the contractor's MBE participation goals.

In response to these arguments, plaintiff cites an opinion of the Comptroller General in *In Re A. Metz, Inc.*, 84–1 Comp. Gen. Proc. Dec. ¶ 386 (April 6, 1984). The Comptroller General draws a distinction between the *responsiveness* of a bid and the *responsibility* of a bidder.

> Responsiveness concerns whether a bidder has unequivocally offered to provide supplies or services in conformity with the material terms and conditions of the solicitation; responsibility refers to a bidder's apparent ability and capacity to perform the contract requirements. While the responsiveness of a bid must be determined on the basis of the bid as submitted, and not on the basis of information provided after bid opening, requirements bearing on the responsibility of a bidder may be met after opening.

*Metz*, slip op. at 7. The Comptroller General goes on to state that requiring bidders to list proposed subcontractors in order to permit evaluation of the bidder's ability to meet MBE contract goals is a matter of responsibility and not of responsiveness. *Id.*, slip op. 8. Accordingly, plaintiff asserts a right to supplement the DB/WBE information contained in its bid—despite the capitalized provision to the contrary in KDOT's bid proposal. Plaintiff's contention is buttressed by an allegation that KDOT has permitted other bidders to amend their DB/WBE bid information. As to the rule regarding second tier subcontracts, plaintiff contends that no such written rule exists and that it should therefore not be bound by the rule enunciated by KDOT. For the reasons that follow, however, we are convinced that KDOT's interpretation of the applicable regulations was a reasonable one. Therefore, KDOT's conclusion that plaintiff failed to establish compliance with the MBE contract goals must stand.

■ As to the question of timing, KDOT clearly had authority to require that all DB/WBE information be submitted at the time of plaintiff's bid. *See* 49 C.F.R. § 23.45(h)(1)(ii). The question thus becomes whether KDOT was reasonable in barring the revision of such information after the bids had been opened. In essence, KDOT views the MBE information as a matter of responsiveness, rather than responsibility. Without deciding whether it was reasonable for KDOT to treat the *identity* of MBE subcontractors as a matter of responsiveness, it is at least true that a bidder's *commitment* to meet the MBE participation goals is reasonably placed within the responsiveness category. As the D.C. Circuit explained:

> The question is, at best, the effect of the bid as signed and submitted. Certainly if it did not bind plaintiff, the later statements could not cure the omission. The effect of such an approach would be to permit a bidder who repented his bid—perhaps on seeing that his bid was too far below the next bidder to be economically sound—to step away from the matter by simply failing to supply the omission.

*Northeast Construction Co. v. Romney,* 485 F.2d 752, 756–57 (D.C.Cir.1973). Although not acknowledged (and perhaps not even realized) by plaintiff, such a risk was present here. Had plaintiff determined that its bid was *too* low, it could simply have chosen not to inform KDOT of the Bones subcontract. Pursuant to the applicable regulations, KDOT would then have rejected plaintiff's bid—exactly the outcome plaintiff would have desired. Plaintiff was thus well situated to decide *after* the bid opening whether to bind itself to the terms of its own bid. Such a rule would clearly undermine the integrity of the entire bidding process.

The Comptroller General's opinion in *Metz* is not inconsistent with our analysis. As the Comptroller General indicates, the decision to award the contract in *Metz* to a bidder who was allowed to supplement its MBE participation information was actually based on a determination that the bidder's noncomplying bid had been submitted only after making a good faith attempt to meet the goals. *Metz*, slip op. at 5. Moreover, the Comptroller General concedes that a subcontractor listing requirement may at times be properly treated as a mat-

ter of responsiveness. Such would be the case, for instance, when the requirement is intended to prevent "bid shopping." *Id.*, slip op. at 8 n. 2. Bid shopping could occur after a successful bidder has been designated the apparent prime contractor and then given leave to contact various subcontractors for price quotations. Armed with the public knowledge that it was the "only game in town," such a successful bidder would carry far greater bargaining power vis-à-vis potential MBE subcontractors than do the multiple bidders who must now deal with subcontractors than do the multiple bidders who must now deal with subcontractors *prior* to the bid opening. Defendant testified by way of deposition that he was well aware of this potential evil and that he and his staff had discussed the problem with minority subcontractors in the area. Those minority subcontractors were generally opposed to a provision granting successful bidders a post-opening opportunity to solicit bids from subcontractors. Deposition of John Kemp, at 47. Keeping in mind the overriding goal of assisting minority subcontractors, defendant thus opted to require that all MBE subcontracts be listed in the bid and that revision of such information after the bid opening be prohibited. Such a policy seems not only reasonable, but even laudatory.

Defendant acknowledges that, having promulgated such a clear-cut rule, he has also carved out an exception. Plaintiff's contention that KDOT has allowed other bidders to amend their MBE participation information is thus correct. When an investigation confirms that a bidder has made an "obvious error" in listing MBE participation information in its bid, KDOT does permit that information to be amended. For example, one contractor submitted a bid that apparently failed to meet the WBE goal. An investigation determined, however, that the contractor had in fact arranged for sufficient subcontracts with WBE subcontractors to exceed that goal, and had even used the prices quoted by those subcontractors in drafting its final bid. Through an oversight, however, the contractor failed to include the name and amount of a WBE subcontract. Because KDOT was able to verify, by comparing the quote and the bid, that the quote had been submitted prior to the contractor's bid, KDOT permitted the contractor to amend its MBE participation information. That "obvious error" exception was considered in connection with plaintiff's bid, and was expressly rejected. Deposition of Warren Sick, at 92. Again, that conclusion seems entirely reasonable. Unlike the case discussed above, plaintiff had no prior knowledge of the Bones Transportation subcontract that would have placed plaintiff's DB participation percentage above the goals set by KDOT. Plaintiff's omission of the Bones Transportation subcontract was thus not an "obvious" error to anyone at the time of the bid opening.

Turning to the rule concerning second tier subcontracts, defendant concedes that KDOT has no clear written rule that either requires *or* forbids the inclusion of such subcontracts when determining a bidder's MBE participation percentage. We conclude, however, that the rule adopted by KDOT is consistent with those written guidelines that do exist. For instance, KDOT's *Standard Specifications for State Road and Bridge Construction,* expressly incorporated into all state road construction contracts, defines "subcontractor" as "an individual, partnership, firm, corporation, or any acceptable combination thereof, or joint venture, to which the *contractor* sublets part of the *contract." Standard Specifications* § 101.63 (emphasis added). Note that the definition does not appear to include an entity to which a *subcontractor* sublets part of a *subcontract.*

More importantly, KDOT's interpretation of the regulations concerning second tier subcontracts is entirely reasonable. KDOT deals only with the successful bidder, who eventually becomes the prime contractor. This relationship permits KDOT to exercise a fair degree of control over the first tier subcontractors with whom the contractor deals. KDOT can also monitor the contrac-

tor to ensure that it lives up to the MBE participation promises contained in its bid. As to second tier subcontractors, however, the chain of control is simply too attenuated to permit effective monitoring. In the instant case, for example, MUV–ER (the first tier subcontractor) has made no contractual promise to KDOT concerning the extent to which Bones Transportation (the second tier subcontractor) will be allowed to perform tasks called for under the contract. Thus, from a contract enforcement standpoint, the second tier subcontractor rule adopted by KDOT is entirely reasonable.

█ Having determined that KDOT's finding that plaintiff failed to meet the DB participation goal fell within a reasonable interpretation of the applicable regulations, we now turn to the second step in the process—the determination of whether plaintiff made a good faith effort to achieve that goal. Again, KDOT's negative conclusion was based on two factual findings. First, KDOT concluded that the fourteen letters and five phone calls directed to DB subcontractors prior to the bid opening did not constitute a sufficiently vigorous attempt to obtain price quotations from such subcontractors. As explained by William Michael Lackey, KDOT's Director of Operations, the letter sent to the fourteen DB's was merely a "generic letter" that failed even to refer to a specific project on which bids were being solicited. According to Mr. Lackey, MBE subcontractors receive hundreds of such letters each year and they are almost uniformly ignored because they are insufficiently specific. Moreover, KDOT determined that plaintiff's follow-up to the letters and phone calls failed to rise to the level of good faith. Finally, plaintiff conceded to KDOT that it had contacted only one of the four DB subcontractors with whom Shears' had arranged subcontracts.

As a second basis for rejecting plaintiff's good faith submission, KDOT refused to consider the fact that the second tier subcontract with Bones Transportation would have enabled plaintiff to exceed the DB participation goal. KDOT denied plaintiff credit for the Bones Transportation subcontract because that DB subcontract had been obtained without contact by, or even the knowledge of, plaintiff. According to KDOT, an individual's good faith simply cannot be predicated on another party's actions.

In response to KDOT's arguments regarding good faith, plaintiff makes various points. It simply disagrees with KDOT's determination that the letters and phone calls, and the subsequent follow-up, directed to DB subcontractors did not constitute a sufficiently vigorous effort. Plaintiff's view was actually accepted at a lower level of KDOT. KDOT's MBE Liaison Officer, Mr. Keyton Barker, initially recommended that plaintiff's good faith submission be accepted. That recommendation was reversed by Mr. Barker's immediate supervisor, however, and it was that reversal that eventually became KDOT's official position. Plaintiff contends that KDOT was bound by law to accept Mr. Barker's recommendation.

Plaintiff also strongly objects to KDOT's refusal to consider the fact that plaintiff eventually discovered the additional DB participation by Bones Transportation. In plaintiff's view, the entire purpose of the MBE regulations is to increase the participation of minority business enterprises in highway construction projects. By accepting plaintiff's good faith submission, KDOT would presumably be effectuating that purpose.

As was true of KDOT's determination that plaintiff failed to comply with the contract's MBE participation goals, we conclude that KDOT's rejection of plaintiff's good faith submission was well within a reasonable interpretation of the regulations. First, KDOT's finding that plaintiff's pre-bid efforts to obtain price quotations from DB subcontractors were insufficiently vigorous falls squarely within the scope of KDOT's administrative expertise. That determination was neither arbitrary nor capricious. Indeed, Mr. Lackey's testimony on this point ably demonstrated why

the courts generally defer to an agency's administrative expertise.

As to plaintiff's contention that the secretary is somehow bound to accept Mr. Barker's recommendation, little need be said. In effect, plaintiff would construe the regulations as a federal mandate that KDOT and other recipients of federal financial assistance cede final decision making authority on the question of a bidder's good faith to an MBE liaison officer located several organizational levels below the agency's chief executive. The regulations express no such intent. In the instant case, it is clear that the relevant KDOT officials were well aware of Mr. Barker's recommendation. Why KDOT chose, in the exercise of its administrative expertise, to reject Mr. Barker's recommendation is not a proper subject for judicial inquiry.

We must also disagree with plaintiff's argument that, because the purpose of the regulations is to encourage MBE participation, KDOT was required to permit participation by these *particular* MBE subcontractors by accepting plaintiff's good faith submission. Clearly, KDOT is not restricted to such a mechanical interpretation of the regulations. Rather, KDOT may encourage contractors to make affirmative efforts to *seek out* minority subcontractors. In furtherance of such a policy, KDOT has chosen to reject plaintiff's contention that fortuitous events such as MUV–ER's contact with Bones Transportation should be allowed to count toward a contractor's showing of good faith. In this particular case, a DB subcontractor was apparently contacted. Were plaintiff's position adopted, future such DB subcontractors might not be so lucky. Accordingly, KDOT's action in rejecting plaintiff's good faith submission works to further the regulations' *long-term* purpose.

In summary, we conclude that defendant and his agency have at all times acted within a reasonable interpretation of the applicable federal and state regulations. Accordingly, even assuming that plaintiff has established that KDOT's rejection of its bid amounted to a deprivation of plaintiff's property, such deprivation was clearly not effected without due process of law. We will thus deny plaintiff's request for permanent injunctive relief by ordering judgment entered in favor of defendant.

Proposed intervenor Shears' seeks to align itself with the position taken by defendant. Having rendered a decision favorable to defendant, we view Shears' motion for leave to intervene as moot. It will thus be denied on that basis.

IT IS THEREFORE ORDERED that judgment be entered in favor of defendant John B. Kemp, Kansas Secretary of Transportation, and against plaintiff Gilbert Central Corp.

IT IS FURTHER ORDERED that the motion of J.H. Shears' Sons, Inc., for leave to intervene is denied.