138 N.J. Super. 33 (1975)
350 A.2d 236
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
BAKERS BASIN REALTY CO., A CORPORATION OF NEW JERSEY, ET AL., DEFENDANT-RESPONDENT. CORTSHIRE DEVELOPMENT CORP., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION; ET AL., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 1975.
Decided December 11, 1975.
*35 Before Judges CARTON, CRAHAY and HANDLER.
Mr. G. Frederick Blazure, Deputy Attorney General, argued the cause for appellant (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Gerald H. Baker argued the cause for respondent and cross-appellant (Messrs. Baker, Garber, Duffy & Baker, attorneys).
The opinion of the court was delivered by HANDLER, J.A.D.
Bakers Basin Realty Co. (Bakers Basin) is the owner of approximately 55 acres of land along *36 Route 1 in Lawrence Township, Mercer County. Cortshire Development Corp. (Cortshire) is a corporation qualified to do business in New Jersey and organized for the sole purpose of developing shopping centers. On February 9, 1971 the State notified Bakers Basin of its intention to take by condemnation a portion (Parcel R64) of this property to construct an interchange for Interstate 295 and Route 1.
Cortshire, with a view toward developing a regional shopping center, entered into an agreement with Bakers Basin, dated August 3, 1971, by which the entire Bakers Basin property was to be conveyed to Cortshire for the sum of $1,197,000. Cortshire entered into similar agreements for the acquisition of properties adjacent to the Bakers Basin property, on September 7, 1971 with John and Jane Kachmar for 18.1 acres at a purchase price of $135,000 and on October 12, 1971 with John and Janina Zagorzycki conveying 14.71 acres for $250,000.
At the time of these transactions Cortshire was fully aware of the State's intention to take Parcel R64. Its plans, however, were unaffected since the intended taking left sufficient access, more than 450 feet, from Route 1 for the development of the shopping center. On November 29, 1971, however, the State revised its taking, which it designated as Parcel 2R64. The effect of the revision was to curtail access along Route 1. (The fee area did not change.) As a result of the revised taking access was denied along the entire Route 1 frontage of the property with the exception of approximately 25 feet. This sharply reduced access made the property unsuitable for a shopping center. The area thus described as Parcel 2R64 was the subject of the condemnation action filed on January 21, 1972.
In addition to the three aforementioned parcels of land, Cortshire negotiated successfully for two more adjoining properties. On February 1, 1972 it entered into a long-term lease with Albert and Cecilia Leopardi for 10.79 acres. Cortshire *37 entered into an agereement to acquire 3.56 acres from Joned Corp. on May 22, 1972, on a form identical to the agreements executed by Cortshire with Bakers Basin, the Kachmars and the Zagorzyckis.
Thereafter, on December 13, 1972, the State further revised its taking to increase the access to the Bakers Basin property from Route 1 to approximately 72 feet. This revision, designated Parcel 3R64, became the subject matter of the first amended complaint filed on January 30, 1973. Nevertheless, the increased access of Parcel 3R64 was still insufficient for the development of a shopping center on the combined properties.
On February 22, 1973 Cortshire filed a complaint in lieu of prerogative writ to compel the condemnation of the five properties which it sought to utilize as an assemblage of lands for its proposed shopping center. On June 1, 1973 summary judgment was granted in favor of Cortshire, and the State was ordered to commence proceedings to include all the adjacent parcels in the existing condemnation action and to fix compensation for damages to all the lots as a single tract of assembled land. This action, however, was reversed by the Appellate Division which remanded for a plenary hearing.
After a complete hearing the trial judge held that Cortshire has standing to challenge the action of the State in the condemnation action and has standing to proceed with the action in lieu of prerogative writ to compel condemnation; that Cortshire is a proper party in interest and has standing to share in the proceeds of condemnation with respect to the first three parcels, Bakers Basin, Kachmar and Zagorzyckis, and that these three parcels should be considered in the condemnation proceeding as a single tract of assembled land. The State has taken an appeal from this determination. The trial judge further ruled that the Leopardi and Joned properties should not be included in the assemblage. Cortshire filed a cross-appeal from this aspect of the decision.

*38 I.
In each of the agreements which Cortshire executed with the adjoining property owners there was a provision for liquidated damages, viz:
In the event of a default hereunder by the Buyer, the Seller shall be entitled to collect the sums as are held as a deposit hereunder and the same shall be deemed as liquidated damages and shall be the sole remedy of the Seller hereunder for any breach by the Buyer.
The primary contention of the State is that by the execution of this form of agreement Cortshire could elect not to proceed with the sale by paying $1,000, the deposit under the contract, as liquidated damages, and that this would be the sole remedy available to the property owners in the event Cortshire determined not to complete the purchase. The type of agreement, it is argued, in practical effect is not a sales contract but an option to purchase, which does not give its holder a sufficient interest in the property to challenge the condemnation or to participate in any resulting awards.
It appears settled in this jurisdiction that the interest in land of an optionee is not such as to give that party status to participate in a condemnation award. It was squarely held in State v. New Jersey Zinc Co., 40 N.J. 560, 576 (1963) that "[a]n option does not create any interest in the land * * * and in New Jersey, at least, the holder of an unexercised option is not entitled to share in the condemnation award * * *."
The critical difference between an option and a contract of sale is that the option imposes no binding obligation on the option holder to complete the purchase. State v. New Jersey Zinc Co., supra at 575-577; Friedman v. Tappan Development Corp., 39 N.J. Super. 103, 197 (App. Div.), aff'd 22 N.J. 523 (1956); also, Hamilton v. Memorial Hospital, 16 N.J. Super. 405 (Ch. Div. 1951).
The provision for nominal liquidated damages and the specification that those damages shall be the sole remedy of *39 the sellers in the event of any breach by the buyer is the basis upon which the State asserts that under these agreements Cortshire is merely an optionee. It has been recognized, usually in direct actions between the parties to an agreement, that if the payment or forfeiture of liquidated damages is actually intended by the parties to supplant completely any obligation to perform, then specific performance is not available as a remedy for breach. In re Tatnall, 102 N.J. Eq. 445 (Ch. 1928), aff'd 104 N.J. Eq. 486 (E. & A. 1929). Some courts have considered that a contract clause which permitted the buyer to terminate the agreement prior to settlement merely upon the forfeiture of payments made on account of the purchase price as liquidated damages effectively transformed the understanding into an option. C.I.R. v. Stuart, 300 F.2d 872 (3 Cir.1962); also, People v. Ocean Shore R. Co., 201 P.2d 438 (Cal. D. Ct. App. 1949), aff'd on rehearing, 90 Cal. App.2d 464, 203 P.2d 579 (1949).
The contract language and its theoretical application, however, are not dispositive of the question whether an option because of the unavailability of specific performance as a remedy, rather than an agreement of sale has come into existence. It was stated in Sooy v. Henkelman, 104 N.J.L. 540 (E. & A. 1928):
* * * the rule is that whether an instrument in writing transferring an interest in real estate shall be construed as an absolute contract for sale and purchase or only an option to purchase depends not on any particular words or phrases, but on the intention of the parties to be derived from the instrument itself by a consideration of its parts, and when that is doubtful, from the circumstances attending it. * * * [at 542]
Also, e.g., Rittenhouse v. Swiecicki, 94 N.J. Eq. 36, 39 (Ch. 1922); Brown v. Norcross, 59 N.J. Eq. 427, 430 (Ch. 1900).
The clause providing for liquidated damages in the subject agreements states quite clearly that such damages constitute the "sole remedy" available if Cortshire defaulted. *40 Nevertheless, on the record developed below, the subject matter of the agreements and surrounding circumstances show forcefully that the parties did not contemplate or anticipate liquidated damages as an alternative of nonperformance, or intend that their respective interests were solely that of optionor and optionee. Cf. O'Connor v. Tyrrell, 53 N.J. Eq. 15, 30 (Ch. 1894). Rather, the evidence shows that the parties intended that their agreements embodied contracts for the conveyance of real estate.
The principals and representatives of each of the contracting parties were uniform in their testimony that the respective agreements were contracts of sale and that there was never an intention to execute only an option. Moreover, while the agreements contain certain contingencies with respect to zoning, utilities, title and soil, the evidence indicates that these are standard in the industry and necessary for the development of a shopping center. And, Cortshire considered itself to be under the obligation to make a reasonable effort to determine the marketability of title, to obtain necessary governmental approvals and to determine the adequacy of soil and utilities, and felt that the liquidated damage clause did not negate its contractual obligations in this respect.
There was also testimony that the liquidated damage clause was a fairly negotiated item, with the purpose "to prevent litigation and to protect the buyer who reasonably performs his obligations under the agreement of sale from any further liability." It was indicated that these clauses are necessary where the development of commercial property requires large preliminary expenditures of time and money. Cortshire anticipated developmental costs in excess of $100,000, and its actual expenditures through October 1, 1974 totalled $122,119.37. Undertakings of this magnitude by Cortshire constituted a substantial consideration in favor of the sellers. On the basis of this evidence the trial judge recognized, and correctly so in light of the special circumstances of this case, that the dominant intention of the parties was performance and the agreements of sale were not designed primarily to *41 give Cortshire the alternative of nonperformance by paying the specified amount. Cf. Nolan v. Kirchner, 98 N.J. Eq. 452 (Ch. 1925).
In addition, it may be inferred that the property owners intended that Cortshire would have the requisite interest and status to participate in the condemnation proceedings and to share in the awards. The Bakers Basin agreement specifically entitled Cortshire to negotiate with the State and to protect its interest in the condemnation action. In State v. New Jersey Zinc Co., supra 40 N.J. at 577, it was noted that such an agreement, even in an option, might vest in the holder standing to participate in a condemnation award.
Paragraph 4 of the agreement between Cortshire and Bakers Basin also sets forth certain conditions relating to zoning, planning, subdivision, frontage and access. It is contended by the State that the fulfillment of these conditions precedent is dependent upon the actions of third parties, both the municipality and the State. Since the fulfillment of these conditions could not be guaranteed by Bakers Basin at the time the condemnation complaint was filed, Cortshire did not have equitable ownership of the property.
The trial judge determined that Cortshire had obtained the necessary governmental approvals and complied with the zoning requirements. We are satisfied that that ruling was correct and that Cortshire substantially had met the contractual conditions, or was in a position to do so. A condition which remains unfulfilled  involving access permits or authorization for a "curb out"  is one which requires the cooperation of the State itself. In this context the pendency of that condition cannot be urged by the State to defeat the binding state of the agreement.
There has been no physical taking of the Kachmar and Zagorzycki properties by the State. Consequently, the State further argues in the direct appeal that it is improper to treat the Bakers Basin, Kachmar and Zagorzycki properties as one tract for the purpose of assessing severance *42 damages because the requirements of unity of ownership and unity of use have not been met.
The record is clear that Cortshire assembled the parcels of land for the purpose of developing a shopping center. The agreements indicate this purpose by providing specifically that each parcel is properly zoned for "a general shopping center." The Kachmar and Zagorzycki agreements specifically contemplate the assemblage with Bakers Basin as part of an "Entire Tract" and warrant that the premises are contiguous and immediately adjacent to each other.
The State argues, nevertheless, that there is no unity of use because development of a shopping center is speculative, citing 4A Nichols, Eminent Domain, § 14.31 (1) at p. 399. It is said that courts are reluctant to award severance damages with respect to separate tracts of land that "are not at least in present use as one unit for the same purpose." State v. Rachl, 136 So.2d 105, 109 (La. App. 1961); 29A C.J.S. Eminent Domain § 140 at 592. The State also cites United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 275-276, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943), to the effect that there must be a reasonable probability of the lands in question being combined with other tracts for a particular purpose in the reasonably near future.
The trial judge found that Cortshire entered into the Bakers Basin, Kachmar and Zagorzycki agreements with the intention of assembling the parcels into a single tract for the purpose of developing a shopping center. The record amply supports the finding that, as a reasonable probability, the lands in question will be combined with the Bakers Basin property in the near future for the purpose of constructing a shopping center. The trial judge so concluded, taking into account Cortshire's vast experience in the industry, the magnitude of its commitment to this project in the way of resources and money, and the fact that the municipality was itself eager for the proposed shopping center. Thus, the integration of the properties, at least in terms of actual planning and preparation for the proposed shopping center, constituted *43 a unity of use sufficiently imminent to permit their treatment as a combined property for condemnation purposes.

II
Cortshire sought to augment the property in the Bakers Basin condemnation by adding as remainders the Leopardi and Joned properties.
Cortshire contends on the cross-appeal that these properties were obtained pursuant to representations by the State that alternate access would be provided, and therefore those properties should be included in the assemblage for condemnation purposes, even though acquired after the filing of the condemnation complaint.
The trial judge, while agreeing with Cortshire's suggestion that the State has been "attempting to work out some access to this property," ruled that Cortshire should have anticipated the problems that might arise because of that change in the amount of access. Although the State attempted to develop an alternate means of access, the judge found that the State never represented that such access definitely could be provided. When Cortshire entered the Leopardi and Joned agreements it had full knowledge that access was a significant problem. As stated by the trial judge, Cortshire took a "calculated risk" in adding these tracts to its assemblage. Accordingly, he correctly determined that the Leopardi and Joned properties would not be included in the assemblage.
In addition, Cortshire urges that since the State amended the Bakers Basin complaint on January 30, 1973, Cortshire should be allowed to include the Leopardi and Joned properties as remainders. The State may be permitted some latitude in amending a condemnation complaint. State v. Applegate, 107 N.J. Super. 159 (App. Div. 1969). The amendment here merely increased the amount of frontage along which access was permitted, from 25 feet to approximately 72 feet. This modest change corrected an error on the State's map and permitted access to both an existing telephone *44 facility and an existing dirt road used to service adjoining landowners. Certainly, this amendment is not sufficient to support a change in the date of valuation.
It should also be noted that the Leopardi transaction involves a lease of vacant land. Notwithstanding its long-term nature and the indicia of ownership in the lessee, Leopardi retains the fee title to its land. Accordingly, Cortshire cannot claim unity of ownership between that property and the Bakers Basin property in light of the undeveloped condition of the land. See Guptill Holding Corp. v. State, 20 A.D.2d 832, 833, 247 N.Y.S.2d 800, 802 (App. Div. 1964) (dictum).
For the foregoing reasons, the determination of the trial judge is affirmed.