AMERICAN COMBUSTION,
INC., Petitioner,

v.

MINORITY BUSINESS OPPORTUNITY
COMMISSION,

and

Office of the Mayor, District of
Columbia, Respondents.

W. G. CORNELL COMPANY OF WASH-
INGTON, INC., American Combustion,
Inc., a Joint Venture, Petitioner,

v.

MINORITY BUSINESS OPPORTUNITY
COMMISSION, et al., Respondents.

W. G. CORNELL COMPANY OF WASH-
INGTON, INC., American Combustion,
Inc., a Joint Venture, Appellant.

v.

DISTRICT OF COLUMBIA, et
al., Appellees.

Nos. 81–74, 81–234 and 81–235.

District of Columbia Court of Appeals.

Argued June 24, 1981.

Decided Jan. 25, 1982.

---

James William Taglieri, with whom Robert Cadeaux, Washington, D. C., was on the brief, for petitioner American Combustion, Inc.

Douglas L. Patin, with whom Herman M. Braude and Leonard A. Sacks, Washington, D. C., were on the brief, for appellant W. G. Cornell Co. of Washington, Inc./American Combustion, Inc.

Leo N. Gorman, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

FERREN, Associate Judge:

This case presents several questions of first impression concerning the Minority Contracting Act of 1976 (the Act), D.C.Code 1978 Supp., §§ 1–851 to –861, *as amended by* D.C.Law 3–91 (September 13, 1980), 27 D.C.Reg. 3280–91, 4169 (now codified at D.C.Code 1981, §§ 1–1141 to –1151):

1. In denying the request of American Combustion, Inc. (ACI) for recertification as a minority business enterprise (MBE), did the Minority Business Opportunity Commission (Commission)[1] improperly interpret and apply the Act's "net profit or loss" and "ownership and control" requirements?[2]

---

1. *See* D.C.Code 1978 Supp., § 1–853, *as amended by* D.C.Law 3–91 § 3 (September 13, 1980), 27 D.C.Reg. 3282–84, 4169 (now codified at D.C.Code 1981, § 1–1143).

2. The Act initially defined a minority business enterprise as follows:

    a business enterprise of which more than 50 percent of the [voting shares or interest in

2. If not, did the Commission nonetheless violate its own rules and depart from its established practices by declining to give ACI time to remedy its deficiencies?

3. If not, did the Commission nonetheless err in concluding that the loss of ACI's certification automatically meant loss of similar certification for W. G. Cornell Co. of Washington, Inc./American Combustion, Inc., A Joint Venture (Joint Venture), of which ACI was an essential party?[3]

4. Alternatively, was the Commission estopped from revoking Joint Venture's certification to bid on a "sheltered market" project?[4]

5. Finally, was the Commission required, in any event, to grant Joint Venture additional time for compliance with MBE requirements, based on the government contract law distinction between "responsive" and "responsible" bids?

We answer all questions in the negative and thus affirm the Commission's orders denying ACI's application for recertification (No. 81–74) and revoking Joint Venture's certification (No. 81–234).[5]

### I.

In 1976, Thomas K. Aquilla, his mother, Josephine M. Aquilla, and Joan M. Coffin— all three of whom are white—incorporated ACI, authorizing 100 shares of stock. Initially, ACI issued 60 shares to Thomas and 40 to Josephine.

In April 1978, Herman Parker (who is black) agreed to purchase 28 shares from Josephine, and Richard Fawley (who is white) agreed to purchase her other 12 shares. Fawley also apparently agreed to purchase eight shares from Thomas, giving Fawley a total of 20 shares. Joan Coffin agreed to purchase five shares from Thomas. In April 1978, therefore, ACI shareholdings, if stock-purchase agreements were reflected, stood as follows:

| T. Aquilla | White | 47 |
| H. Parker | Black | 28 |
| R. Fawley | White | 20 |
| J. Coffin | White | 5 |
| | | 100 |

The stock-purchase agreements, reflecting a per share price of $1,000, were substantially similar. Each purchaser made a relatively small down payment: Parker, $1,000; Fawley, $500; Coffin, $1,000. Each agreed to pay the balance due on a pro rata basis over a 10-year period, failing which the purchaser was to surrender the unpurchased stock to the seller without further obligation. There was, however, a significant proviso: annual payments were due and payable only out of employee bonuses— if any—which the purchasers received from ACI. If ACI paid no bonuses, or if they were insufficient to cover the amount due, the balance payable would be carried forward without default. Although the pur-

---

such business enterprise] is held by individuals who are members of a minority and that more than 50 percent of the net profit or loss attributable to that business enterprise accrues to members of a minority. [D.C.Code 1978 Supp., § 1–852(b).]

The District Council amended this definition by replacing the phrase bracketed above with the phrase "ownership and control." D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C.Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)).

3. The Act defines "joint venture" to mean:
   a combination of contractors performing a specific job in which minority business enterprises participate and share a percentage of the net profit or net loss. [D.C.Law 1978

Supp., § 1–852(d) (now redesignated as D.C. Code 1981, § 1–1142(4)).]

4. The Act defines "sheltered market" as:
   a process whereby contracts or subcontracts are designated before solicitation of bids, for limited competition from minority business enterprises on either a negotiated or competitive bid process. [D.C.Code 1978 Supp., § 1–852(g) (now redesignated as D.C.Code 1981, § 1–1142(7)).]

5. Assuming the timeliness of Joint Venture's appeal in No. 81–235 of the trial court order denying its motion to enjoin the District of Columbia from awarding the bid on the sheltered market project to another contractor, *but see* D.C.App.R. 4(II)(a)(1), it follows from affirmance of the Commission's orders that the trial court's order also must be affirmed.

chaser apparently could vote all the shares, the shares remained with the seller (in effect pledged as collateral) until all payments had been made.

On April 28, 1978, ACI applied to MBOC for certification as an MBE. ACI stated that Parker owned 28% of its outstanding shares and that Jacquelyn Cubero (also a minority group member) owned 24%.[6] ACI, however, failed to submit verification of Cubero's interest. The Commission denied ACI's application.

On August 23, 1978, Steve Davila (an Hispanic) agreed to purchase 24 shares of ACI stock from Thomas Aquilla (apparently, the shares Cubero originally had agreed to purchase). Davila agreed to pay $1,800 per share with annual installments totaling $4,320. Davila made no down payment, however, and the purchase agreement allowed Davila, in case of default, to surrender his stock to Aquilla without further obligation. (As it turned out, Davila never made a payment on his stock.) The agreement also provided that Aquilla would hold the shares until all payments had been made.

ACI submitted a new application for MBE status on September 5, 1978. MBOC certified ACI on October 18 for a two-year period, as authorized by statute.[7] At the time of certification—if the various stock purchase agreements were reflected—ACI shareholdings stood as follows:

| | | |
|---|---|---|
| T. Aquilla | White | 23 |
| H. Parker | Black | 28 |
| S. Davila | Hispanic | 24 |

| | | |
|---|---|---|
| R. Fawley | White | 20 |
| J. Coffin | White | 5 |
| | | 100 |

On August 16, 1979, George P. Simpson (who is black) agreed to purchase 24 ACI shares from Aquilla at $2,075 per share. Although ACI claims that Aquilla only owned 23 shares of stock at this time (Davila was not yet in default on his first payment), the agreement with Simpson stated that Aquilla owned 47 shares.[8] Simpson paid $4,800 down with the remainder due over 10 years out of ACI employee bonuses, provided that Simpson—like the other stock purchasers—reserved the right to surrender his stock at the end of this period without further obligation. The agreement also permitted Aquilla to hold Simpson's shares, in effect as pledges, until the deferred purchase price had been fully paid. ACI did not report this change in stock ownership to the Commission.

In August 1979, therefore, assuming the effectiveness of all stock-purchase agreements, ACI shareholdings stood as follows:

| | | |
|---|---|---|
| T. Aquilla | White | 23 |
| H. Parker | Black | 28 |
| G. Simpson | Black | 24 |
| R. Fawley | White | 20 |
| J. Coffin | White | 5 |
| | | 100 |

On September 4, 1980, ACI entered into an agreement with W. G. Cornell Co. of Washington, Inc. (Cornell) to form Joint Venture for the purpose of bidding on a mechanical construction contract with the District of Columbia under a "sheltered market" program. *See* D.C.Code 1978 Supp., § 1–852(g) (now redesignated as

---

**6.** The Act originally defined "minority" as "Blacks, Hispanics, American Indians, Orientals, and Eskimos." D.C.Code 1978 Supp., § 1–852(a). The District Council amended this definition to read as follows:

> Black Americans; Native Americans; Hispanic Americans with origins in Central and South America, Mexico, and the Caribbean; who, by virtue of being a member of the foregoing groups, have been found by the Council of the District of Columbia to be economically and socially disadvantaged because of historical discrimination practiced against these groups by institutions within the United States of America. [D.C.Law 3–91 § 2(a) (September 13, 1980), 27 D.C.

Reg. 3280–81, 4169 (now codified at D.C. Code 1981, § 1–1142(1)).]

**7.** The Act provides:

> A certificate of registration shall expire two years from the date of approval. An application for renewal of a certificate must be submitted 90 days prior to the expiration date or as the Commission determines. [D.C. Code 1978 Supp., § 1–858(c) (now redesignated as D.C.Code 1981, § 1–1148(c)).]

**8.** Apparently, an ACI secretary told a Commission investigator in an off-the-record conversation that Davila had left ACI in July 1979.

D.C.Code 1981, § 1–1142(7)); note 4 *supra*. The Commission had advised Cornell that ACI was listed as a certified MBE eligible for that program.

On September 5, ACI and Cornell submitted letters to the Commission requesting certification of Joint Venture, with a view to bidding on a mechanical construction contract for the Washington Convention Center. On September 16, the Commission approved Joint Venture's application to submit a bid. A month later, however, on October 18, 1980, ACI's MBE certification expired. *See* note 7 & accompanying text *supra*. ACI had not filed an application for recertification.

On October 30, 1980, the Department of General Services opened the bids on the Convention Center mechanical construction contract (originally scheduled to be opened on October 9) and declared Joint Venture the low bidder. Following that announcement, Lavell Merritt of the Washington Area Construction Industry Task Force, and Curtis L. Smith, President of Carlton's Mechanical Contractors Inc. (another bidder on the project), filed letters protesting ACI's minority status. As a result, the Department of General Services withheld the award of the contract pending an investigation. On November 13, 1980, the Commission advised ACI that its MBE certification had expired on October 18, 1980, and that if ACI failed to submit an application for recertification by November 30, 1980, the Commission would drop ACI as an active MBE.

On November 18, 1980, ACI submitted a renewal application. On the same day, however, Courtland Cox, Executive Director of MBOC, wrote ACI that the Commission had determined after investigation that ACI was not a minority business and, in fact, that the Commission never should have granted it MBE status. (Apparently, ACI's recertification application and Cox's letter crossed in the mails; Cox specifically noted that "as of this writing, ACI has not applied for renewal of its certification of registration with MBOC.")

On December 2, 1980, the Commission formally denied ACI's application for recertification. It notified ACI of this decision by letter of December 8, 1980. ACI noted an administrative appeal on December 11, 1980, and the Commission conducted a hearing on January 6, 1981.

At this hearing, several facts were established (in addition to the facts relating to the stock-purchase agreements discussed above): Neither Simpson nor Parker had paid more than the original down payments for their stock. ACI had declared no bonuses. Three of the five directors of ACI were white. On the other hand, both Simpson and Parker testified about their experience in the industry and their significant roles in the corporation. Simpson testified, for example, that he had become president of ACI in November 1980. Simpson and Parker each testified, moreover, that he had a great deal to lose if ACI failed.

On January 9, 1981, the Commission informed Joint Venture that it had determined ACI was not a certified MBE and, as a consequence, that Joint Venture was not eligible for the sheltered market program. The bid on the construction contract, therefore, was to be awarded to another contractor.

On January 12, 1981, ACI held a stockholders' meeting. Coffin and Fawley resigned as directors, leaving ACI with three directors: Aquilla and two minorities (Simpson and Parker). In addition, Simpson and Parker agreed to amend their stock purchase agreements to eliminate the right to surrender stock without liability for payment.

On January 19, 1981, the Commission formally denied ACI's appeal of the December 1980 order rejecting the application for recertification as an MBE (a denial reflected ten days earlier in the Commission's communication to Joint Venture). In its decision, the Commission made no reference to ACI's reorganizational activities of January 12. The Commission characterized the stock purchase agreements as "stock options," noting, for example, that Simpson and Parker had not paid anything for their

stock since the down payments, that the obligation to pay each year was contingent on ACI's payment of bonuses, and that even without further payment Simpson and Parker each had the option, after ten years, of surrendering their stock without further obligation.

The Commission accordingly found that, as a result of these arrangements, Simpson and Parker did not risk more than 50% of the loss if ACI were to fail. In addition, the Commission found that a majority of ACI's directors were white. Finally, the Commission found that Davila's stock had reverted to Aquilla in July (before Aquilla's sale of this stock to Simpson), and that ACI had not reported this change to the Commission.

The Commission thereupon concluded that ACI did not meet the statutory requirements for a minority business in that (1) minorities did not hold "more than fifty (50) percent of the ownership and control" of ACI, and (2) "more than fifty (50) percent of the net profit or loss ... [did not accrue] to members of a minority." See D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C.Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)); note 2 supra. In addition, the Commission concluded that it could have revoked ACI's certification prior to its expiration because of ACI's failure to report a change in ownership affecting its minority status. See D.C.Code 1978 Supp., § 1–858(b), (d)(3) (now redesignated as D.C.Code 1981, § 1–1148(b), (d)(3)).

On February 3, 1981, the Commission held a hearing on the revocation of its certification of Joint Venture. On February 17, the Commission formally revoked Joint Venture's certification. In its decision, the Commission issued more detailed findings of fact with respect to its decision denying ACI's application for recertification as a minority business. Then, with respect to Joint Venture, the Commission concluded that its certification was entirely contingent on ACI's status as an MBE. Thus, the Commission concluded that expiration of ACI's certification, combined with the Commission's refusal to recertify ACI, compelled the revocation of Joint Venture's certification as well.

On January 23, 1981, ACI had filed a timely petition for review by this court of the Commission's denial of recertification as an MBE. Similarly, on February 24, 1981, Joint Venture filed a timely petition for review of the Commission's decision with respect to Joint Venture.

In addition to the administrative proceedings, Joint Venture had filed a complaint in the Superior Court on January 12, 1981 seeking injunctive relief barring the District of Columbia from awarding the mechanical construction contract to another party. The trial court had denied Joint Venture's motion for a preliminary injunction on January 23, 1981. Joint Venture filed a notice of appeal on February 23, 1981. See note 5 supra.

On February 27, 1981, this court ordered consolidation of ACI's and Joint Venture's petitions for review of the Commission's orders and Joint Venture's appeal of the trial court's order denying a preliminary injunction.

## II.

In reviewing an agency ruling, "[w]e must determine (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether the conclusions of law follow rationally from the findings." George Washington University v. District of Columbia Board of Zoning Adjustment, D.C.App., 429 A.2d 1342, 1345 (1981). Accord, Monaco v. District of Columbia Board of Zoning Adjustment, D.C.App., 409 A.2d 1067, 1070 (1979); Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission, D.C.App., 402 A.2d 36, 41–42 (1979); D.C.Code 1981, §§ 1–1509(e), –1510(a)(3)(A), (E). ACI challenges the Commission's decisions by reference to the latter two criteria.

A. As a preliminary matter, we must resolve a question about the status of the record before the Commission and this

court. ACI maintains that the Commission, in its January 19, 1981 ruling on ACI's appeal, should have considered evidence of ACI's actions on January 12, 1981, even though these actions came after the Commission's hearing on January 6 (on the December 1980 decision not to recertify) denying ACI recertification.

We conclude that the Commission properly refused to take ACI's post-hearing actions into account in making its findings of fact and conclusions of law. The Commission must base its ruling on evidence in the record. *See* Minority Business Opportunity Commission Rule 308.12, 26 D.C.Reg. 2788 (1979). Here, ACI took its remedial actions after the record had been closed (and after a decision, in fact, had been communicated to Joint Venture on January 9). ACI cites no authority—and we have discovered none—that would require the Commission to reopen its record and rescind its decision based on later actions by ACI. At most, the question whether to reopen the record was a matter of agency discretion. *See Potomac Electric Power Co. v. Public Service Commission*, D.C.App., 402 A.2d 14, 19 (en banc) (Commission reasonably exercised its discretion in not accepting last minute filing), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). We perceive no abuse of Commission discretion in declining to reopen this case. *See id.* We review the matter based on the record as of January 6, 1981.

B. We conclude that the Commission's findings of fact and conclusions of law were supported by substantial evidence, and that these findings rationally led to the conclusions drawn. First, there was substantial evidence to support the Commission's characterization of Simpson's and Parker's stock-purchase agreements as merely "option contracts." The key distinction between an option to purchase and a contract of sale is that an option does not impose a binding obligation to complete the purchase. *State v. Bakers Basin Realty Co.*, 138 N.J.Super. 33, 38, 350 A.2d 236, 239 (1975), *aff'd*, 74 N.J. 103, 376 A.2d 1189 (1977) (per curiam). *Accord, Durepo v.*

*May*, 73 R.I. 71, 82–83, 54 A.2d 15, 21–22 (1947). Here, Parker and Simpson were not obliged to purchase their remaining stock except out of bonuses which never were paid. If, moreover, Parker and Simpson did not pay for the stock in 10 years, they could surrender it without obligation. The Commission also could consider the fact that Davila supposedly "owned" stock in ACI for a year without paying anything for it.

The Commission's finding that the minority shareholdings primarily were option contracts rationally led to its conclusion that these agreements did not transfer stock ownership within the meaning of D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C. Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)); note 2 *supra*. We endorse that conclusion. Bearing in mind that the Commission is charged with enforcing the statute and making the regulatory scheme work smoothly, *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of Electrical Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), we give "great deference to the interpretation given the statute" by the Commission. *Chesapeake & Potomac Telephone Co. v. Public Service Commission*, D.C.App., 378 A.2d 1085, 1089 (1977) (quoting *Udall v. Tallman, supra*). *Cf. George Washington University, supra* at 1348 (deference should be given to agency interpretation of its own regulations). We agree it is particularly important, in light of the Council's intent to aid minorities affected by past discrimination, *see* D.C.Code 1978 Supp., § 1–851(a) to (f) (now redesignated as D.C.Code 1981, § 1–1141(1) to (6)), that companies having only a superficial level of minority ownership and control not take improper advantage of sheltered market programs. *See* M.B.O.C. R. 300.3, 26 D.C.Reg. 2779 (1979). The statute itself expressly requires the Commission, in applying the statutory criteria, to be sure that an "applicant is a *bona fide*, minority business enterprise." D.C.Code 1978 Supp., § 1–858(a)(1) (now redesignated as D.C.Code 1981, § 1–1148(a)(1)) (emphasis

added). The Commission's conclusion that the agreements in question did not transfer bona fide ownership to the minorities here was a reasonable application of the statute which we will not disturb.

■ Second, there was substantial evidence that minorities (Simpson and Parker) comprised only two of the five members of the ACI Board of Directors and that business could be transacted in their absence. This, in turn, rationally led to the Commission's conclusion that minorities did not "control" ACI. *See* D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C.Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)); note 2 *supra.*

■ Finally, it also follows from the stock-option nature of the minority holdings that the Commission rationally concluded Simpson and Parker did not risk more than 50% of the loss if ACI failed, as required by D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C.Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)). *See* note 2 *supra.*

■ The Commission's conclusions with respect to the lack of minority ownership, control, and risk of loss inexorably led to its decision not to recertify ACI as an MBE. *See* D.C.Law 3–91 § 2(b) (September 13, 1980), 27 D.C.Reg. 3281, 4169 (now codified at D.C.Code 1981, § 1–1142(2)); note 2 *supra.* The Commission's further finding and conclusion that ACI failed to report a change in ownership (Davila to Thomas Aquilla) affecting its minority status in 1979—even if erroneously based, in part, on evidence outside the record, *see* note 8 *supra*—could not have affected the result. The question before the Commission was not whether it should have revoked ACI's certification, but whether ACI was, at the relevant time, qualified for certification. The Commission's other findings and conclusions answered this question completely.[9] *Compare Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 384 A.2d 412, 419 (1978) (unclear if Board would have awarded license based only on two of the three principal findings). We will not overrule an agency's decision merely because it went outside the record on a collateral matter which, given the record before it, could have had no bearing on the ultimate decision. *See United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 527–30, 66 S.Ct. 687, 693–695, 90 L.Ed. 821 (1946); *Market Street Railway Co. v. Railroad Commission,* 324 U.S. 548, 561–62, 65 S.Ct. 770, 777, 89 L.Ed. 1171 (1945); *Braniff Airways Inc. v. C. A. B.,* 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967).

### III.

ACI argues, in the alternative, that even if it had not timely complied with MBE requirements, the Commission should have given ACI time to remedy its deficiencies. This argument is two-pronged. First, ACI maintains that the Commission's own rules[10] and practice[11] mandate a grace period to permit a noncomplying MBE to meet the requirements. Second, ACI asserts that because the Commission initially had granted MBE status to ACI based on the same organizational structure that the

---

9. This is not a case where the Commission concluded that a business would not be recertified (although qualified) because of misconduct.

10. The Commission's rules call for it to conduct a "compliance review" of MBEs to make sure that certification requirements are maintained. *See* M.B.O.C. R. 305.1–.7, 26 D.C.Reg. 2786 (1979). As a result of that compliance review, the Commission "*may* seek compliance by the MBE prior to instituting further proceedings." M.B.O.C. R. 305.3, 26 D.C.Reg. 2786 (1979) (emphasis added). There is no record of any compliance review conducted in this case.

11. ACI contends that the Commission's letter of November 13, 1980 indicates a policy permitting MBEs a grace period within which to file for recertification. At the January 6, 1981 hearing on ACI's application for recertification, the MBOC Executive Director stated that the Commission had a policy of extending the certification of an MBE having an expired certification if the MBE is recertifiable. This would avoid a gap in certification which could cost an MBE a contract.

Commission later used to reject ACI's recertification, the Commission must give ACI the advice and time necessary to meet the stiffer MBE requirements than those originally imposed.

■ Without deciding whether, under some circumstances, these two arguments may have force, we conclude that ACI forfeited any such claim it may have had here by failing to file a timely application for renewal of its MBE certification.

The Act expressly provides that "[a]n application for renewal of a certificate must be submitted 90 days prior to the expiration date or as the Commission determines." D.C.Code 1978 Supp., § 1–858(c) (now redesignated as D.C.Code 1981, § 1–1148(c)); see note 7 supra. The Commission's rules reaffirm this 90-day requirement, M.B.O.C. R. 304.1, 26 D.C.Reg. 2785 (1979). By failing to apply for recertification before expiration of its initial MBE certification, ACI lost valuable time during which the Commission might have advised about certain changes necessary to maintain MBE certification. ACI, therefore, is not in a strong position to argue that the Commission owed it more time for compliance following expiration. Although the Commission's letter to ACI on November 13, 1980—indicating that ACI had until November 30, 1980 to file for recertification—arguably estopped the Commission from revoking ACI's MBE status until November 30, 1980, the facts are that the Commission did not deny ACI's application for recertification until December 2, 1980, and, of greater significance, that the only material changes ACI made in its minority structure occurred in January 1981, well after the November 30 deadline and the Commission's January 6, 1981 hearing.

Under these circumstances, we conclude that whatever time ACI should have had to comply with MBE requirements had expired before the Commission's decision denying recertification.

## IV.

Joint Venture contends that even if the Commission properly revoked or declined to recertify ACI as an MBE, ACI's loss of certification should not have affected Joint Venture's certification and right to the mechanical construction contract. Joint Venture claims error in the Commission's conclusion that the certification decision as to ACI was "controlling on the question of continuation of the joint venture."

■ We will not disturb the Commission's interpretation of the statute, since it was reasonable. See Udall v. Tallman, supra 380 U.S. at 16, 85 S.Ct. at 801; Chesapeake & Potomac Telephone Co., supra at 1089. Indeed, a contrary conclusion by the Commission (permitting a joint venture to maintain its certification after its participating MBE had lost its own certification) would have frustrated the purposes of the Minority Contracting Act. See D.C.Code 1978 Supp., § 1–851(a) to (f) (now redesignated as D.C.Code 1981, § 1–1141(1) to (6)).

The crux of Joint Venture's argument is that it is an entity altogether distinct from the MBE (ACI) and, accordingly, that Joint Venture's certification must be viewed on its own merits. In making this argument, Joint Venture stresses the fact that both the statute, D.C.Law 3–91 § 5(e) (September 13, 1980), 27 D.C.Reg. 3288, 4169 (now codified at D.C.Code 1981, § 1–1148(b)), and the Commission's rules, M.B.O.C. R. 301.3, 26 D.C.Reg. 2781 (1979), require a separate certification application. More specifically, the statute states:

> Any joint venture desiring to be registered as a joint venture in the District of Columbia shall make and file with the Commission a written application on such form as may be prescribed by the Commission.

The Commission's Rule 301.3, provides:

> Individual certification of an MBE participating in a joint venture shall not automatically qualify the joint venture for certification. *Each joint venture must be certified as a separate business entity* under this section in order to participate in programs established by the Commission. [Emphasis added by Joint Venture.]

Joint Venture's reliance on these separate certification requirements is misplaced. The statute and regulation imply only that a certified MBE's participation in a joint venture is not alone sufficient to authorize the joint venture's participation in a sheltered market program. The purpose of the statute, as well as that of the Commission's own rules, *see* M.B.O.C. R. 301.1, 301.5–.7, 26 D.C.Reg. 2781–82 (1979), is to require the Commission to examine the extent of the MBE's participation carefully before certifying a joint venture. It does not follow from this cautious approach to joint venture certification that, once the venture is certified, a continuing MBE certification no longer will be necessary to the continuing vitality of the venture's own certification.

The Commission's rule preceding the one cited by Joint Venture states:

> Minority business enterprises participating in joint ventures *must be individually certified* in accordance with the provisions of the Act and the requirements of these rules. [M.B.O.C. R. 301.2, 26 D.C. Reg. 2781 (1979) (emphasis added).]

But even without this rule, Joint Venture's argument makes no sense in light of the clear legislative purpose to foster minority business through sheltered markets. *See* D.C.Code 1978 Supp., § 1–851(a) to (f) (now redesignated as D.C.Code 1981, § 1–1141(1) to (6)). Joint Venture cannot use the participation of a minority business to enter a sheltered market and then simply disassociate itself from the implications of that MBE's loss of certification.

■ Joint Venture's final argument, that the Commission lacked authority to revoke a certification once granted, is also without merit. The Commission has the express statutory authority and duty to "[r]eview and determine the continued eligibility of contractors certified by [it]." D.C.Code 1978 Supp., § 1–859(k) (now redesignated as D.C.Code 1981, § 1–1149(11)).

It would make no sense to require the Commission to review the continued eligibility of certified contractors, and also require contractors to report changes which affect their eligibility, *see id.* § 1–858(d)(3) (now redesignated as D.C.Code 1981, § 1–1148(d)(3)), and yet to deny the Commission the power to act upon the information gained from its review.[12]

### V.

■ Joint Venture next argues that the Commission is estopped from revoking its certification. In order to establish an estoppel, Joint Venture must show (among other things) that it justifiably relied on the Commission's actions. *See Wieck v. District of Columbia Board of Zoning Adjustment*, D.C.App., 383 A.2d 7, 11 (1978); *Nathanson v. District of Columbia Board of Zoning Adjustment*, D.C.App., 289 A.2d 881, 884 (1972). Joint Venture has not done so here.

Joint Venture emphasizes that in its contacts with the District of Columbia, no one ever said that certification was contingent on continued certification of ACI as an MBE. Joint Venture, however, does not assert that the Commission ever said that once Joint Venture was certified, ACI's own certification was irrelevant. Although the Commission's letter to Joint Venture stated that "[t]he certification of registration will expire upon award and/or completion of the contract referred to in the above mentioned invitation to bid," this cannot properly be read to mean that Joint Venture's certification would not be revoked for any other reason.

The Commission's conclusion that the validity of Joint Venture's certification was contingent on ACI's continued certification was a reasonable interpretation of the statute and Commission regulations. Joint

---

12. Joint Venture's argument that our reading of the review section of the statute would render superfluous the Commission's revocation powers is unpersuasive. The revocation section of the statute has a separate purpose. It gives the Commission the power to suspend or revoke certification for conduct which, although improper, might not render a contractor otherwise ineligible for certification.

Venture cannot justifiably claim surprise at that interpretation.[13]

## VI.

Finally, Joint Venture argues that even if it had no right under the Minority Contracting Act or the Commission's rules, or as a matter of estoppel, to cure its certification (including ACI's), the fact that it was low bidder gave it the right, under government contract law, to attempt to obtain recertification before the next lowest bidder received the contract. In government contract parlance, Joint Venture says it was a "responsive" bidder entitled to the opportunity to prove it is capable of being "responsible" for the contract.

■ More specifically, a responsive bid is one that conforms to the material elements of an invitation to bid. *See Scanwell Laboratories, Inc. v. Thomas,* 172 U.S.App. D.C. 281, 285 & n.4, 521 F.2d 941, 945 & n.4 (1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Northeast Construction Co. v. Romney,* 157 U.S.App.D.C. 381, 388–89, 485 F.2d 752, 759–60 (1973). *See generally* 1B J. McBride & T. Touhey, Government Contracts, § 10.70 (1981); Meyer, *The Role of the Comptroller General in Awarding Formally Advertised Government Contracts,* 18 Ad.L.Rev. 39, 45–55 (Summer 1966). A bid that is not responsive is not curable after the bid is opened. *See Rossetti Contracting Co. v. Brennan,* 508 F.2d 1039, 1044 & n.15 (7th Cir. 1975); *Northeast Construction Co., supra* at 388–89, 485 F.2d at 759–60. *See generally* 1B J. McBride & T. Touhey, *supra* at § 10.70; Meyer, *supra* at 46.

■ Questions of bidder responsibility, on the other hand, "relate to whether a given bidder has the necessary resources and experience to perform a given job." *Northeast Construction Co., supra* at 388, 485 F.2d at 759. *See Scanwell Laboratories, Inc., supra* at 286, 521 F.2d at 946; *Federal Electric Corp. v. Fasi,* 56 Hawaii 57, 66, 527 P.2d 1284, 1291 (1974). *See generally* 1B J. McBride & T. Touhey, *supra* at § 10.70; Meyer, *supra* at 55–66. A lack of bidder responsibility is curable after the bids are opened. *See Northeast Construction Co., supra* at 389, 485 F.2d at 760; *Ocean Electric Corp. v. Laird,* 154 U.S.App. D.C. 24, 25–26, 473 F.2d 154, 155–56 (1972); *Federal Electric Corp., supra* at 66, 527 P.2d at 1291.

Joint Venture contends that any deficiency in its minority status was a problem of bidder responsibility. The District argues, to the contrary, that a valid MBE certification is a material specification of a contractor's eligibility to bid on a project and, as such, is an element of bidder responsiveness which cannot be remedied once bids have been opened. We agree with the District.

■ Under the sheltered market program, only minority contractors are eligible to bid on the project. This minority involvement is a material element of the bid. It follows that a nonminority contractor or joint venture cannot be a responsive bidder. *See Rossetti Contracting Co., supra* at 1045 (failure of contractor to submit appropriate commitment to minority hiring made bid nonresponsive); *Northeast Construction Co., supra* at 389, 485 F.2d at 760 (same); *cf. Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629, 633 (M.D.Ala.1980) (federal MBE requirements "established an additional qualification for responsiveness"). It

---

13. Joint Venture also argues that the Commission is estopped to revoke its certification because the Commission had informed Cornell that ACI was a certified MBE. This contention fails. When Cornell first contacted the Commission, ACI was still a certified MBE. Joint Venture does not allege that Cornell was told anything more than this. Joint Venture, moreover, is not just Cornell; it is a joint venture between Cornell and ACI. ACI knew or should have known that its certification was close to expiration, and this knowledge must be imput-

ed to Joint Venture. *See Coles v. Redskin Realty Co.,* D.C.Mun.App., 184 A.2d 923, 926 (1962) (mutual agency relationship between joint ventures is generally the same as that between partners); *Barlow v. Cornwell,* D.C. Mun.App., 125 A.2d 63, 67 (1956) ("generally notice to, or knowledge of, an acting partner with respect to any matter relating to a transaction within the ordinary scope of the firm's business is notice or knowledge as to all the partners" (footnote omitted)).

could frustrate the overall purpose of the Minority Contracting Act to permit a contractor to bid on a project and then, only if successful, tighten up its minority involvement to meet certification standards. *Cf. Northeast Construction Co., supra* at 388, 485 F.2d at 759 ("Government's broad policy objective may be prejudiced by the omission" of statement of commitment to minority utilization).[14]

*Affirmed.*

14. In concluding that a bidder's minority status is a matter of "responsiveness," not "responsibility," we do not imply that every technical failure to maintain minority certification as of the time of the bid automatically must disqualify that bidder from consideration. The Commission's own rules and policies authorizing a grace period to cure defects, *see* Part III. *supra*, may have the effect, in some circumstances, of retroactively curing a technical defect in responsiveness. But this possibility does not convert the analysis, by way of government contract law concepts, into a matter of bidder responsibility, creating an additional legal avenue to cure an otherwise invalid minority status. Compliance with the Act and its regulations alone govern responsiveness.